49 U.S. 183 (1850)
8 How. 183
CHARLOTTE TAYLOR, BY JAMES M. WALKER, HER NEXT FRIEND, APPELLANT,
v.
JAMES TAYLOR, JULIA SCARBOROUGH, GODFREY BARNSLEY AND JULIA, HIS WIFE, JOSEPH SCARBOROUGH AND WILLIAM SCARBOROUGH, ROBERT M. GOODWIN, NORMAN WALLACE, AND ANDREW T. MILLER.
Supreme Court of United States.

*195 It was argued by Mr. Holmes, for the appellant, and Mr. Johnson (Attorney-General), for the appellee.
*199 Mr. Justice DANIEL delivered the opinion of the court.
The object of the complainant below, (the appellant here,) as disclosed in her bill, is to vacate the deed, executed on the 22d day of January, 1828, by her before her marriage, conveying to William Taylor in trust for the use of the mother of the grantor for life, (exempt from the debts of her father,) and after the death of her father and mother, for the use in equal portions of the said grantor, and of her brothers and sisters, all the property real and personal which was given to the said grantor by the will of her uncle Robert Isaac, whose will is made an exhibit in the cause and referred to in the deed.
The grounds on which this deed is impeached are the following:  that it was founded on no real consideration; was executed during the nonage of the complainant, and whilst she was living in the family of her parents; that it was extorted from her by false representations, both as to her filial duties, and her rights to the property left her by her uncle; and of extreme urgency and harsh treatment on the part of her parents, to procure its execution; and of the hope, by a compliance with their importunities, of reconciling her parents to her marriage with her husband, which marriage they had theretofore opposed. The objection of nonage must be surrendered in this investigation, it being ascertained that the complainant was some few months over majority when the deed was executed. The other allegations, as resting upon the proofs in the cause, and upon the law as applicable to them, remain for consideration.
The rules of law supposed to control the contracts of parties who do not stand upon a perfect equality, but who deal at a disadvantage on the one side, whether applicable to the relations of parent and child, trustee and cestui que trust, attorney and client, or principal and agent, have been laid down in various cases in the courts both of England and of our own country. To trace these rules to the several cases by which they have been propounded would be an undertaking rather of curiosity, than of necessity or usefulness here, as the extent to which this court has applied them, or is disposed to apply them in cases resembling the present, may be found within a familiar and direct range of inquiry. They are aptly exemplified by the late Justice Story, in his treatise on Equity Jurisprudence, Vol. I. § 307, where, speaking of frauds which "arise from some peculiar confidence or fiduciary relation between the parties," *200 he remarks,  "In this class of cases there is often found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which courts of equity act in regard thereto stands independent of any such ingredients, upon a motive of public policy; and it is designed in some degree as a protection to the parties against the effects of overweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment. These courts will therefore often interfere in such cases, where, but for such peculiar relations, they would wholly abstain from granting relief, or grant it in a very modified and abstemious manner." He proceeds, § 308,  "It is undoubtedly true, that it is not upon the feelings which a delicate and honorable man must experience, nor upon any notion of discretion, to prevent a voluntary gift or other act of a man whereby he strips himself of his property, that courts of equity have deemed themselves at liberty to interpose in cases of this sort. They do not sit, or affect to sit, in judgment upon cases as custodes morum, enforcing the strict rules of morality. But they do sit to enforce what has not inaptly been called a technical morality. If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and cunning, and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. Courts of equity will not, therefore, arrest or set aside an act or contract, merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels the one to make a full discovery to the other, or to abstain from all selfish projects. But when such a relation does exist, courts of equity, acting upon this superinduced ground, in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance." Applying the principles thus annunciated and drawn from an extensive collection of the English cases to the relation of parent and child, and to transactions occurring in that relation, the same author remarks, § 309,  "The natural and just influence which a parent has over a child renders it peculiarly important for courts of justice to watch over and protect the interests of the latter; and therefore all contracts and conveyances, whereby benefits are secured by children to their parents, are objects of jealousy, and if they are not entered into with scrupulous good faith, and are not reasonable under the circumstances, they will *201 be set aside, unless third persons have acquired an interest under them."
The same principle has been clearly put by Justice Washington, in the case of Slocum and Wife v. Marshall, 2 Wash. C.C. 400, where, in stating that case, he remarks,  "The grantor, a young lady who from her birth had not but on one occasion left the roof of her father,  bound to him by the strong ties of filial affection,  accustomed to repose in his advice and opinion the most unbounded confidence, and to consider his request ever as equivalent to a command,  is informed by him that a certain portion of her property had been conveyed to him by her mother, but that the same, from some legal objection, had failed to take effect. She is then requested to confirm this title, and at the same time is assured by her father, that his design in obtaining this confirmation is to promote her interest as well as his own. She reflects upon the proposal, and, influenced by the double motive of promoting her own interest and that of her father, and of fulfilling the intentions of her dead mother, she makes the conveyance." He proceeds,  "A transaction attended by such circumstances will naturally excite the suspicions of a court of equity." It has been insisted that, for the principles just stated, the sanction of this court cannot be avouched; but that, on the contrary, they have been weakened, if not rejected, by the doctrines ruled in the case of Jenkins v. Pye, 12 Peters, 241. The peculiar features of the last-named case, which may in some respects distinguish it from the one now under consideration, and be thought to bring it less obviously within the principles above stated, need not be pointed out; but we inquire what are in truth the doctrines ruled in the case in 12 Peters; and whether they are not substantially, nay literally, those propounded by Justices Story and Washington. In the case of Jenkins v. Pye, this court refuse to adopt the rule which they said had in the argument been assumed as the doctrine of the English chancery, viz. that a deed from a child to a parent should, upon considerations of public policy arising from the relation of the parties, be deemed void. They deny, indeed, that this is the just interpretation of the English decisions relied on, but declare that all the leading cases they have examined are accompanied with some ingredient showing undue influence exercised by the parent, operating upon the fears or hopes of the child; and showing reasonable grounds to presume, that the act was not perfectly free and voluntary on the part of the child. But the court, whilst they deny that a deed from a child to a parent should primâ facie be held absolutely void, as unequivocally declare, that "it is undoubtedly *202 the duty of courts of equity carefully to watch and examine the circumstances attending transactions of this kind, when brought under review before them, to discover if any undue influence has been exercised in obtaining the conveyance." Between the doctrine here ruled and the principles stated by Justices Story and Washington, no difference, much less any contradiction, can be perceived. For why this watchfulness, thus enjoined as a duty, this severe and peculiar scrutiny as applicable to contracts between parent and child, but that they are justly "objects of jealousy," rendered so by the relation of the contracting parties,  a relation aptly and naturally productive of powerful influence on the one hand, and of submission on the other,  subjecting such transactions to presumptions never attaching a priori to contracts between parties standing upon a perfect equality.
And now let the character of the contract under consideration, and of the circumstances surrounding the execution of that contract, be subjected to the test rationally and justly imposed by the rules above stated.
This is a contract between parent and child, operating by its terms exclusively for the benefit of the former, and to the prejudice of the latter; for it transferred from her a valuable interest, by the very terms of the transaction admitted to be legally and absolutely hers, and by the same terms transferred it without the shadow of an equivalent received or proffered; and for which, the testimony conclusively shows, none could possibly be given. Thus far the provisions of the contract.
With regard to the circumstances attending and surrounding its execution. It is shown that the grantor in this deed, though of age, had little more than attained to majority; that she was living in the house with her parents,  her only home; and may fairly be presumed to have been liable to the influence of feelings and habits which, in the absence of contravening evidence, would control the dispositions and conduct of a youthful female thus situated. She might be moulded to almost any thing, in compliance with the earnest wishes (with her habitually yielded to as commands) of her parents. Those parents, who once had lived in affluence and luxury, had, with all the habits and necessities which such a condition naturally creates, by commercial reverses been brought to indigence; from the date of the purchase by Robert Isaac of the property in dispute, had been permitted by him to occupy and enjoy it. In fact, it was apparently their only means of shelter or support. In this state of the family, Robert Isaac by his will bestowed the whole of this property upon the complainant; and it has been *203 argued that, with her knowledge of the situation of her parents, the impulses of filial duty and affection might of themselves have formed a sufficient ground work for the complainant's conveyance. However hazardous it might be to prescribe, as a rule of right or of property, imperfect obligations which the law does not originally enforce, this argument can be deemed satisfactory in instances only in which the motives supposed to enter into such obligations are shown to have been free and unconstrained in their operation. In the present instance, too, independently of the influences which will be shown to have been brought to bear upon the transaction, it is thought that the injunctions of filial duty and affection would have demanded something less than the surrender of all possessed by the grantor; and would have been satisfied with a concession, as to which there probably would never have existed a difficulty,  one, indeed, that seems to have been assented to in practice,  the occupation and enjoyment of the property during their lives, by the parents of the grantor. Nay, it would seem that proper parental tenderness, and solicitude for the welfare of the child, or the true principles of rectitude and fairness, would have permitted nothing beyond this. And in the estimate of motives which may have led to the transaction under review, it should not be without weight, that this same filial duty and affection, however commendable in themselves, and however their spontaneous action may be recognized and binding, strengthen the probability of their being converted into means of wrong and oppression; and this very probability it is which challenges the duty of watchfulness and jealousy in the courts, in scanning the transactions of those whose peculiar situation exposes them to danger from such means.
Immediately after the death of Robert Isaac, it seems that the various appliances designed to withdraw from the complainant the fruits of the bounty of her affectionate uncle were put into strikingly active operation. Directly following the death of Isaac, it is charged in the bill, came the urgency of the complainant's family, and their reproaches against her for having intercepted, as they said, the bounty which but for her would have flowed to the family; and for having dictated to her uncle the disposition of his property; thereby having ruined their prospects, and broken the heart of complainant's father. The natural effects of such appeals upon the feelings of an affectionate and sensitive girl, or even upon a spirit awake to the impulses of pride alone, can easily be comprehended. Then, as is alleged, was the reluctance of the complainant to despoil herself of her property ascribed to the avarice of her intended husband; *204 and then, too, amidst her perplexity and distress, upon consultation between both her parents, was suggested to he the device of a letter from her, declaring her belief of the wish of the testator, Isaac, to bestow the property for the benefit of the family; and asking the consent of the father of the complainant to a settlement of the property in conformity with such a wish. Although these allegations are not supported by direct statements of witnesses, yet the intrinsic evidence flowing from other conduct of the parties to these transactions, and that presented by the written documents in this cause, impart to the above allegations a force equal, if not surpassing, that which an explicit narrative by witnesses could give them. And here it is worthy of remark, that the will of Robert Isaac contains no expression nor hint of a desire, or intention, that the property should go according to the supposition assumed; or according to the provisions of the deed subsequently executed. This circumstance alone should be one of controlling influence, even if the testator could be regarded as a person of a capacity and character of the most inferior grade. But none can fail to perceive, from the proofs in this cause, that the testator was a man of intelligence and sagacity, extensively practised in the business of life. He strongly declares his affection for his niece, and as clearly gives to her, and to her only, the property in dispute. What room is here for assuming, that others, and not this niece, were the chief objects of his bounty? Such an assumption is forbidden by every rule of law, or of common sense; it goes very far, of itself, to stamp with fraud and contrivance the means resorted to in order to divert that bounty to other ends.
We will next consider the letter (Exhibit A, filed with the answer of Goodwin) addressed by the complainant, then Charlotte Scarborough, to her father; concocted, as is alleged by the complainant, between her parents, as preparatory and introductory to the wrong about to be consummated; in which letter she professes her readiness and her desire to settle the property derived from her uncle to the use of her parents for their lives, and after their deaths to the use of all the children equally. The will of Robert Isaac was admitted to probate on the 9th day of January, 1828, and amongst the persons who qualified as executors of that will, were William Scarborough, the father of the complainant, and William Taylor, the trustee in the deed now sought to be vacated. These men, the depositaries of the solemn trust reposed in them by Isaac,  fully capable of comprehending his will, and one of them sustaining the further obligation of a parent to protect the interests of this *205 young woman,  make themselves the ready instruments to betray this confidence, and this in violation of the clearest language in which their duty could possibly have been prescribed. How far this conduct can be excused or palliated under the pretext of duty to Mrs. Scarborough, founded on the alleged marriage contract, or on any supposed intention of Isaac flowing from the same source, will hereafter be shown in the conduct of Scarborough and Taylor in reference to this very property, when dealing with it for their own personal advantage. This conduct will furnish a most efficient clew in unravelling the texture of the deed in question.
On the 10th of January, 1828, the day succeeding the probate of the will of Robert Isaac, was written the letter above mentioned from Charlotte Scarborough to her father. It seems impossible to resist the evidence furnished by this singular production, that it was a fabrication, designed to conceal the very facts and circumstances which it palpably betrays. In the first place, it may be inquired why such a letter should be written, and whether it would be usual or probable in a transaction between persons thus situated, if dictated solely by an admitted sense of propriety, and sanctioned by a willingness of both the parties to it. Can we accredit the probability of a formal diplomatic communication from a daughter just grown, to her father, residing under the same roof, to justify an act which they both believed it a sacred duty to perform? Again, let us look at the declaration here so anxiously and pompously paraded, that, in the act about to be performed by this daughter, she "was unbiased by any control whatsoever; and that, in the liberty she was then using, she was acting by her own free will, dictated by her feelings alone, and unknown to any person," and we shall perceive an apprehension, or consciousness of suspicions, which it was believed the simple transaction itself would neither prevent nor allay. Here are the very clausul inconsuet pointed to in Twyne's case, as the sure badges of that which they are intended to hide. Why should this young woman have taken such deliberate pains to declare, and to place as it were on record, a history of her motives,  her entire exemption from persuasion, authority, or even advice, in what she was about to do in obedience to affection and a sense of duty? If these had constituted the real incentive to her act, would they have left room for one thought or surmise of dishonor, connected with the objects of that affection and duty? Such suspicions and surmises are rather the offspring of colder calculation, and of the "compunctious visitings" that wait on contemplated wrong. And again, in the concluding paragraph *206 of this letter, may be seen a strong corroboration of this charge in the complainant's bill, of the painful and discreditable imputations which had been made against her, as inducements to come into the proposed arrangement. The language of this paragraph is as follows:  "Most thankful do I feel for being made the simple instrument of accomplishing the will of him who has so kindly and generously placed his confidence in me, and in acting thus, convince the world that my devoted affection for him was pure, disinterested, and unbiased by future expectation." It will naturally occur to every one to inquire, why this young woman should accuse herself, or fancy herself accused by others, of unworthy motives or conduct, because she had been the object of her uncle's affection? The rational solution of the matter would seem to be this,  that the assumption of such motives on the part of those around her, represented by them, too, as entering into the opinions of the world, had been pressed as an efficient means of influence; and that a vindication from their existence furnished a plausible coloring for the proceeding about to be affected. The tone, the language, the artificial structure of this letter, its familiarity with the terms peculiar to the business of life, all bespeak it, in our judgment, not the production of an inexperienced girl, but of a far more practised and deliberate author. Lastly may be mentioned, with respect to this letter, the care with which it has been preserved, and placed beyond the control of this daughter, as a prop to a transaction which could not stand alone, and as a means of stilling the murmurings of future complaint; the very ends for which it at last emerges from its secret recess.
Next in the chain of evidence, and closely following its harbinger and herald, we will notice the deed itself from the complainant, conveying from her every description of property derived from her uncle; and it is one of the peculiarities of this conveyance, not without significance, that it was executed before there was an inventory made by the executor, to inform the grantor specifically what she had a right to claim or to bestow. Turning then to the recitals of this deed, they must be regarded as wholly irreconcilable with truth; and especially with that uberrima fides, that fulness of candor and fairness, required in transactions between parent and child; transactions upon their face, too, operating to the disadvantage of the latter. This deed sets out a marriage contract entered into between Scarborough and his wife, anterior to their marriage, purporting to cover a portion of the property in dispute; it then states the failure of this contract by reason of an omission to record it, and *207 proceeds to declare, that, some doubts having been suggested as to the validity of the said marriage settlement, from the omission to record the same, the said William Scarborough did, in consequence of such doubts, transfer and convey all his right, &c., to the said Robert Isaac, and that the said Isaac, having departed this life, had left this property, with certain personal estate, to his niece Charlotte Scarborough; and that she to whom the devise and bequest had been made, being desirous of carrying the marriage settlement into effect according to the original intent of the parties, had, on coming of age, determined to convey all her right, title, and interest in the property derived from her uncle, for that purpose.
The deductions from these recitals,  nay, their necessary meaning, we may add, their literal import,  are these. That the conveyance from Scarborough to Isaac was with the sole view of effectuating the marriage settlement, and of curing any defects attributable to that contract;  that Isaac took the property clothed with this trust, and for no consideration moving from himself; and vesting in him an absolute title or estate;  that his devise and bequest to his niece were purely to secure the same objects, and that she, fully aware of all these acts and intentions, had, as soon as she could legally do so, determined upon their accomplishment. Such are the declarations and recitals contained in this deed; not one of which, save the statement of a project of a marriage settlement, that is not by the evidence on the record shown to be palpably false. Thus, if we look to the deed from Scarborough to Isaac of the 13th of May, 1820,  to the agreement between Isaac and McHenry as the agent of A. Low & Co., in February, 1826,  and to that between Robert Isaac and Andrew Low, on the 8th of March, 1827,  and also to the return of the marshal of the sale under execution of the personal property in dispute, we find that Isaac was the purchaser and exclusive owner of all this property, for a pecuniary consideration paid by him of nearly twenty-three thousand dollars. Looking next from the recitals of this deed to the will of Robert Isaac, we find no ambiguity, no declaration, hint, or implication in the will to sustain these recitals; but every thing to falsify and condemn them. We there see clearly the motive of the testator; his affection for his favorite niece, and the subjects and the mode with and by which he designed that his affection should be manifested. He gives to her, clear of all trusts or encumbrances, "the lot, dwelling-house, and all other improvements thereon, which formerly belonged to her father, together also with the plate, furniture of all kinds, books and prints, all of which *208 were purchased and paid for at marshal's sale by me." If this clause of the will were shown to and clearly understood by the complainant, it is difficult to conceive how it could be made rationally to express or imply a duty on her part to disrobe herself of this bounty, as being clearly designed for others, and not for herself. The conduct of these persons, Scarborough and Low, and of Taylor, who was named as trustee both in the marriage settlement and in the deed from Charlotte Scarborough, furnishes convincing evidence of the light in which they viewed any obligation supposed to be adhering to this property, and forming a binding consideration, either legal or moral, for the deed now impugned; that is, an obligation to bestow it in conformity with the stipulations of the marriage contract. But it may be naturally asked, if this supposed obligation was limited to Charlotte Scarborough. Did it not, if existing at all, extend equally to her father, and to the trustee in the settlement, and to others acquainted or connected with that contract? In a moral view, at least, no difference is perceived in the position of these parties, and it is not pretended that Charlotte Scarborough sustained any legal obligation to convey away this property. Yet it is seen by the record, that William Scarborough, to serve his convenience or his interest, had no difficulty in subsequently encumbering it both to Low and to Taylor, the trustee in the marriage settlement, or in subsequently selling it out and out to Isaac; and that this same trustee, Taylor, manifested as little scruple for the sanctimony of his trust, in its application for his own benefit. And it seems to us to be a most pregnant state of facts connected with this deed, that, when it was to be executed, Taylor and Low, who had so dealt with this property as to be necessarily cognizant of the falsehood of the recitals it contained, were carried to the house of Scarborough to become, the first the trustee, the second a witness to this instrument. The other witness to this deed, John Guilmartin, seems to have been taken under the stress of necessity, from the refusal of James Taylor to attest the deed, and the manner in which the transaction impressed itself upon Guilmartin is evinced in his deposition, in which he says that he inquired of Miss Scarborough whether this deed was her voluntary act, but was permitted to have no answer from her, and was silenced in his inquiries by the remark from Low, that the witness had been sent for to attest the deed, and for no other purpose. This witness further swears, that the deed was not read to nor by the grantor in his presence. He states, moreover, this uncalled for remark on the part of the father (although witness was not permitted to obtain information *209 from the child),  that he, Scarborough, had sent for the witness to attest "a deed from Miss Scarborough to her mother, which as a dutiful child she had made." Again, when this deed from Charlotte Scarborough was to be proved, the only witness to its execution called on was Andrew Low; he who knew that its recitals were inconsistent with truth, he who deemed all inquiry about the willingness of the grantor to make it to be impertinent. John Guilmartin was passed by; he might have revealed, if called, circumstances coeval with the transaction, which would be calculated to remove or to weaken the influence of seeming acquiescence, or of the lapse of time; circumstances which time alone, in the absence of direct impeaching testimony, would be competent entirely to cover up. The testimony adduced in support of the deed from the complainant falls far short of the object for which it was intended; much of that evidence, too, seems to have been given under influences necessarily detracting from the weight which it otherwise might have had. It wholly fails to countervail the evidence arising from the statements of witnesses on the other side; from the relative positions of the parties; and, more than all, from the intrinsic nature and force of the documents relied on both by plaintiff and defendants in the court below. From a careful analysis of the facts and circumstances of this case, we think the conclusion cannot be resisted, that the deed from Charlotte Scarborough to William Taylor, of the 22d of January, 1822, was not a fair and voluntary transaction; but was drawn from her by means and under influences which rendered that conveyance void. We are, therefore, of the opinion, that the real property conveyed by that deed should be reconveyed to the said Charlotte, now Charlotte Taylor; and that the several articles of personal property bequeathed to her by her uncle, Robert Isaac, so far as the same are now in existence, and in the possession or under the control of Mrs. Julia Scarborough, or of any other person acting under her authority, or claiming from her and not for valuable consideration without notice, or claiming under like circumstances from any person by virtue of the provisions of the deed of trust above mentioned, should be delivered up to the complainant as her own property; but it is the opinion of this court, that rents and profits for the use and occupation of the real estate above mentioned, or compensation for the use and enjoyment of the personal property bequeathed to the complainant, should not be allowed her under all the circumstances attending this case; they are accordingly hereby denied her. It is therefore, upon consideration, adjudged, ordered, and decreed, that the decree of the Circuit Court *210 for the Sixth Circuit and District of Georgia, pronounced in this cause at the April term of that court in the year 1846, be, and the same is hereby, reversed; and this cause is remanded to that court, with directions to decree therein in conformity with the opinion herein above expressed.
Mr. Justice WAYNE remarked, that the decree given in this case was that which he wished to be given in the court below. But the judges of the Circuit Court not being of the same opinion, the bill of complaint was dismissed, that there might be an early appeal to the Supreme Court. He concurs altogether in the reasoning and conclusions which have just been announced by the court.
Mr. Justice NELSON and Mr. Justice WOODBURY dissented.

Order.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Georgia, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to decree therein in conformity to the opinion of this court.