Johnson, J.
The deed sought to be set aside, was executed September 1, 1859.
The legal title to the premises was then in the plaintiff, Lisette, and the defendant, her mother, the former holding* two undivided thirds.
It had been so placed with the assent of the mother in 1846. By the deed from Tucker at that time, she took according to her-husband’s will, one-third in fee, instead of her dower under the statute. The day Lisette became of age, the deed now in controversy was executed by Lisette to her mother and her step-father, Joseph Kellerman, in consummation of an alleged family settlement, made by A. M. Dengler, an attorney, selected by the mother for that purpose, who came to the conclusion that Lisette was only entitled to six hundred dollars out of her father’s estate (the Mercer county land not included).
Under the employment of the mother, he made what he calls a settlement, and adjudged that the step-father should Lave a deed for half of this property, and the mother the other half, and that they should jointly make a mortgage *248 to Lisette to secure the payment of this $600, iu two years, with six per cent, interest.
The settlement and award was made, and the necessary papers prepared for execution before Lisette became of age> without, any consultation with her, and without her knowledge, until on her way, with her mother, and by her directions, to Lengler’s, to execute them.
To carry out Lengler’s award, he had prepared a deed, whereby Kellerman and wife conveyed all their title, being the one-third, to Lisette, and she reconveyed to them jointly the whole title. They then executed back to her a mortgage to secure the $600 awarded to her, which was evidenced by note.
As Mrs. Kellerman alr'eady owned one-third, the effect of this transaction, was to increase -her interest in the lot one-sixth, and to increase Kellermau’s from a marital right as husband in his wife’s one-third to an ownership in fee of one-half.
The evidence warrants, us in finding that the occasion for this transaction arose from the dissatisfaction of the step-father, growing out of the fact that he had been engaged then some thirteen years, helping, as he claims, to save and improve this property.
He naturally valued his efforts and labors as the chief ■cause of its value, and was of the opinion that Lisette was not entitled to anything more than she had received in her raising.
’ It also warrants us in finding that, to. the industry and good management of the mother,- before she married Keller-man, this estate of her first husband was kept together and saved to herself and her children, and that she was a kind, self-sacrificing mother and wife, anxious to do equal • and exact justice to her husband as well as to her child.
She recognized and was anxious to satisfy the equitable demands of her dissatisfied husband, and accordingly, some days before Lisette became of age, doubtless after consultation with her husband, she employed Lenglerto adjust this family difficulty, and told him all the circumstances as far *249 as she knew them, and told him “to settle it right by me (her), and right by my husband, and right by her” (Lisette).
This Dengler attempted to do, without any communication with Lisette, or without any accounts or vouchers, or any computation in details of the value of the claims of either party.
He had acquired a general knowledge of the matter, but he does not claim to have done more than to make a general examination, and to make what he deemed an equitably award.
What demand the step-father had against Lisette, to require that she should convey one-half of this land to him, •does not clearly appear from the evidence. ■
The first that Lisette knew of what was being done, was after the deeds were ready to be signed, and while on her way to Dengler’s, where she was taken by her mother to execute them.
Mrs. Kellerman did not then herself know, or if she did, did not tell her daughter, how it had been settled, but says: ■“ I told her we were going to settle it there, and give her what was coming to her, and settle it fair for me and my husband and for her too.” -Before arriving at Dengler’s house all the plaintiff knew was this, and that she was being taken to Dengler’s to put her name to a paper that was there for that purpose.
When they arrived, Dengler told her that her father and mother had been there two days before, and had fixed it all up ; that the papers were all made up, and that “ she had just to put her name under, and that was all she had to do.”
Dengler says that Mrs. Kellerman came to his bouse several times, and told him how matters stood, how property was purchased, and about paying taxes, for filling up about the new house, etc., and about Lisette’s board, but he is unable to give any details or information of the basis •on which he made his award, or upon what valuable consideration to Lisette he required her to convey to Kellerman one-half the property.
*250 Mrs. Kellerman says she kept no accounts, but had some vouchers, and Kellermau had none.
Mr. Somber, the parish priest, who happened in when; the papers were being signed, and heard them explained,, and witnessed their execution, says plaintiff signed them without objection, and gives it as his opinion that it was-a just settlement, though he had no knowledge of the matter further than was there explained.
It is not shown that any account stated, of the claims legal or equitable of either of defendants, was made out, or that any value was fixed upon the property so conveyed, in payment thereof.
All we know is that Dengler fixed this matter up according to his idea, after hearing from one side only. He does not claim to have carefully estimated the items of debit and credit to each, nor to have considered the fact that a larger part of the increased value arose from rise in real estate.
The mother stood in peculiar relations to her daughter. As her mother, she had the custody and control, exercising-personal care of her nurture and maintenance. This control she continued to exercise, until the daughter’s marriage,, some two years after the settlement.
At her husband’s death, she took upon herself the administration of her husband’s estate, took possession of it,, and thereafter carried on the business, and paid his debts. She made no settlement, and filed no accounts, as required by law.
She was also tenant in common with her child in the-property, acting for both, as the child had no other guardian.
Upon her second marriage, her husband became head of' the family, and with her used and enjoyed this property in common, receiving all the rents and profits, as well as the earnings of the daughter. They both stood in loco parentis. Courts of equity are especially charged with the cognizance of trust relations of this character.
It is their particular duty, in case of children and other, kelpless persons, to protect the weak, and to prevent those- *251 holding fiduciary relations from, using their positions and. influence for their own aggrandizement.
All their power, influence, and skill is to be used for the benefit and advantage of the beneficial owners, and not for personal gain.
All increase, gains, and profits, whether arising from natural increase in value, aside from the efforts of the trustee, or from such efforts, are the absolute property of the beneficiary.
The rules governing parties occupying such relations is-well stated in Adams Eq. (marginal page 184) :
“ Where any person stands in a relation of special confidence toward another, so as to acquire an habitual influence over him, he can not accept from him a personal benefit without exposing himself to the risk, in a degree proportioned to the nature of their connection, of having* it set aside as unduly obtained. An attorney, therefore, purchasing or taking a benefit from his client, whilst the-relationship of attorney and client exists, and in respect of that matter wherein it exists, must show that he took no advantage of his influence or knowledge. . . . The same general principle applies to all the variety of relations in which dominion may be exercised by one person over another,but in proportion as the relationship is less known and definite, the presumption of fraud is less strong.”
The note of the American editors, on the same page, is-as follows: “A court of equity looks with extreme jealousy on transactions between parties who stand in any fiduciary relation, or relations of a similar character, by which an undue influence may be obtained by one over the-other; and unless he who receives the benefit can show that it was conferred understandingly, and with full knowledge of the circumstances, and apart from the bias of that connection, it will be set aside. Such relations are those of attorney and client, parent and child, guardian and ward,” etc.
In Harrison v. Guest (6 De G. M. & Gr. 452), the lord chancellor says : “ If persons standing in a particular rela *252 tion to one another, deal as vendor and purchaser, the court expects the purchaser, when the purchase is complained of by the seller, to show that the seller had due protection afforded him. . . . Wherever there is any fiduciary relation between the parties, the court throws the burden of proof on the party who sets up the transaction against the person whom he was bound to protect.”
In Cocking v. Pratt (1 Ves., Sr. 400), the court said: “ Though there is no great evidence of undue influence, yet the court will always look with a jealous eye upon a transaction between parent and child just come of age, and interpose if any advantage is taken. The mother plainly knew more than the daughter, and only says .in general terms she believes she concealed nothing from her.” And a composition between mother and daughter, entered into four months after the latter came of age, though afterward ratified by the daughter’s husband, was set aside.
“ A trustee will not .be permitted to obtain any profit or advantage to himself in managing the concerns of his cestui que trust, but whatever benefits of profits are obtained, will belong exclusively to the cestui que trust. In short, it may be laid down as a general rule, that a trustee is bound not to do anything which can place him in a position inconsistent with the interest of his cestui que trust, or which will have a tendency to interfere with his duty in discharging it. And this doctrine applies, not only to trustees strictly so called, but to other persons standing in like relations. . . . It applies in like manner to executors and administrators, who are not permitted to purchase up the debts of the deceased on their own account; but whatever advantage is thus derived by them, by purchases at and under value, is for the common benefit of the estate. Indeed, the doctrine maybe more broadly stated, that executors or administrators will not be permitted, under any circumstances, to derive a personal benefit .for the manner in which they transact the business, or manage the assets of the estate.” 1 Story’s Eq., § 322. See also § 322a, and §§ 466, 466a, and 468.
*253 Another rule applicable to transactions of this kind is, that there is no law against a child bestowing upon a parent any property of which she may be the owner, if freely and voluntarily done, when the gift originated in the mind of the child, or was unsuggested by any agency of the parent. Bergen v. Udall, 31 Barb. 25; Story’s Eq. Jur., § 309a.
In Gordon v. Gordon, 3 Swanston, Lord Eldon says that, “ in all cases of this kind, full and complete communication of all material circumstances is what the court must insist on.” Again: “ There must not only be good faith and honest intentions, but a full disclosure; and, without full disclosure, honest intention is not sufficient.”
In Bergen v. Udall, supra, it is said : “ In all dealings between parent and child, under such circumstances, the most scrupulous good faith — uberrima jides — must be observed, and the weaker party must be put upon an equal footing-with the stronger, by a complete disclosure of all material facts, and the abnegation, as far as possible, of any control or dominion, as well as of all mere selfish projects or attempts.”
That class of cases where family settlements are sustained, notwithstanding some proof of parental influence, and those where contracts will be set aside because of such undue influence, are readily distinguishable, and that distinction rests on sound principles of equity and justice.
In both classes, where, from the relations of the parties, there is a probability of such undue influence having been exerted, the court watches the whole transaction with great jealousy, not merely for the purpose of ascertaining “that the person likely to be so influenced fully understood the act he was performing, but also for the purpose of ascertaining that his consent to perform that act was not obtained by reason of the influence possessed by the person receiving the benefit; not that the influence itself flowing from such relations is either blamed or discountenanced by the court; on the contrary, the due exercise of it is considered useful and advantageous to society; but this court holds as an inseparable condition that this influence should *254 be exerted for the benefit of the person subjected to it, and not for the advantage of the person possessing it. The case of parent and child is undoubtedly one of this class of ■cases, and is prominently put forward as such in all cases illustrating this principle.” Hogton v. Hogton, 15 Beav. 278.
In this ease it was added “ that if the settlement of the property be' one in which the father acquires no benefit not .already possessed by him, and if the settlement is a reason.able and proper one, the court will support it, even though it may appear that some influence was exerted by him to induce the son to execute it, and provided, also, there was no suppression of what is true, or suggestion of what is false. . . . When, however, the son confers on the parent, by the transaction, some advantage which he did not previously possess, then the principle which prevails in the first class of cases interposes, and this court, to use the words of Lord Langdale, in Archer v. Hudson, 7 Beav. 560, does not interfere to prevent an act, even of bounty, between a parent and child; but it will take care that such child is placed in such position as will enable him to form .an entirely free and unfettered judgment, independent altogether of any control.”
Guided by these principles, we are unanimous in the • opinion that this deed, made on the day that Lisette became eighteen years old, in execution of an alleged settlement, made by one unauthorized to bind her, without her being fully advised of her rights, and while acting under the influence and control of her mother and step-father, was not binding upon her.
We are likewise agreed that it can only be supported as a family settlement, upon the inherent equities of the transaction, in view of the facts and circumstances of the case.
We are further agreed that, as to Mrs.'Eellerman, such •equities do exist in her favor.
Aside from her services as plaintiff’s mother in her maintenance and education, it appears that after this mortgage was executed, and after it had been canceled by Eellerman, by erasing his name, she, out of her own means, and with *255 -out his knowledge, paid the same, with interest, and that this payment was accepted from her by the plaintiffs under such circumstances as amount to a ratification in her fávor.
The amount thus paid, some $700, was about equal to the value of the one-sixth of the property which she received by the deed, not estimating Kellerman’s improvements.
In view of these facts, and of the beneficial nature of her services to plaintiffs’ property and its management and improvement, we are of opinion that no substantial injustice has been done to the plaintiffs by the conveyance of this one-sixth to her mother.
3. As to the conveyance of one-half to Joseph Keller-man, a majority of the court are of opinion it is without ■any such equities to support it.
It has been urged with much ability, and supported by .an array of authorities, that Joseph Kellerman had no claim, either legal or equitable, against his step-daughter, or against her property, which a court of equity would recognize.
His claim was that he had erected this building, and helped to improve the lot, paid taxes, etc.
Assuming, however, for the purposes of this case, that this would constitute an equitable claim against the plaintiff during her minority, it was only a claim to an account in equity, in which he would be allowed for his betterments, and be subject to account for rents and profits.
In taking this conveyance, he gets the real estate, with all his improvements, for which he pays nothing, unless he can establish a claim for maintenance of the child.
When Lisette was but ten years old, he erected this building, with the intention of “fixing it.” with her when she became of age.
On the day she became of age, the papers were executed, in pursuance of previous plans, and an award made by an attorney employed by the defendants. Unless Kellerman can avail himself of the meritorious services of his wife, *256 much of which were rendered before his marriage, there. Is no consideration to support this conveyance to him.
He was dissatisfied with the settlement, as he thought, lisette should give up the land without any consideration. The mortgage, though formally handed her at Dengler’s, was not in fact delivered to the plaintiff until 1866, some five years after due, and was never recorded. It and the note which it secured, and which was never returned to her, remained in defendant’s custody until December, 1866. ■When he did at last deliver the mortgage, on Christmas, 1866, his name was erased from it, thus repudiating, so far as he was able, all obligation to perform his part of the settlement by Dengler.
Before this mortgage was returned, he had flatly refused to pay the mortgage debt, telling the plaintiffs that he wanted back the money he had put in it, and if they would pay that they might have the property, as he did not want it, and his wife too. His opposition to performing this contract was such that his wife, out of her own means, and without his knowledge, paid off the mortgage, charging, her daughter not to tell Kellerman, as he did not intend it should be paid.
So far as he could, he repudiated and canceled the contract. He, in fact, paid no consideration for the deed to. him.
Eor these, and other reasons that might be given, we think the conveyance of the undivided half, to JosephKellerman, should be set aside,- and the property restored to her, leaving him to such an account with the plaintiff as-he may be entitled to in equity.
It is claimed that the plaintiff has ratified and confirmed this deed by long acquiescence, and by accepting payment of the mortgage.
Certainly Kellerman can claim nothing from this payment made contrary to his wishes, after he had canceled the mortgage, and after his refusal to pay.
The plaintiff was, at the time, feme covert, and so, at law,. Incapable of making a binding contract of ratification, and- *257 there' is no equity in favor of Kellerman, that estops her as against him.
Furthermore, it does not clearly appear, that the plaintiff was fully advised of her rights in the premises at the time of such payment.
Nothing but a clear and unequivocal ratification, after a. full knowledge of the right-to impeach, and with the intention to do so, will satisfy a court of equity. Dunlap v. Mitchell, 10 Ohio, 117; Hammond v. Allen, 2 Sumner, 400; Wood v. Douns, 18 Ves. 119; Dunbar v. Trendennich, 2 B. & B. 304; Cockerell v. Chomley, 1 Russ. & Myl. 418; Michoud v. Girod, 4 How. 560.
4. It is said this action is barred by lapse of time.
It was commenced May 31, 1870, less than eleven years, after the deed was made.
For nearly three years, and until her marriage, the plaintiff remained at home, under the dominion of her parents, ignorant of her fights and unadvised by those, who were-properly her protectors. As to her, Kellerman stood in-loco parentis.
By the code, as well as in equity, time would not run against her, while the fiduciary relation existed, nor until the discovery of the fraud against her, and the burden of showing such knowledge as would make her guilty of' laches, or set the statute to running, rests upon the defendant. Long v. Mulford, 17 Ohio St. 508.
This is an action to recover the title to real estate, and is not barred by the statute. It does .not, affirmatively, appear that it -accrued before plaintiff’s marriage, and if not, time does not run against her until such disability is removed.
What constitutes such laches as will bar a claim like this, growing out of fiduciary .relations, and independent of the statutory limitations of civil actions, must depend on the circumstances of each case as it arises. Paschall v. Hinderer. 27 Ohio St. 568, and cases cited; Long v. Mul *258 ford, 17 Ohio St. 508; Taylor v. Taylor, 8 How. 183; Piatt v. Longworth, 27 Ohio St. 159.
We think the plaintiff’ is entitled to the relief prayed for as to Joseph Kellerman, and that the judgment in his favor, and the conditional order as to • the Mercer county land, should .be reversed, and that the judgment in favor of Mrs. Kellerman should be affirmed.

Judgment accordingly.