## INGRAM v. LEWIS et al.

Circuit Court of Appeals, Tenth Circuit. January 10, 1930.

No. 142.

Eliot D. Turnage, of Muskogee, Okl. (Charles A. Chandler, of Muskogee, Okl., on the brief), for appellant.

R. Emmett Stewart and C. F. Gordon, both of Muskogee, Okl. (Chas. G. Watts and E. J. Broaddus, both of Wagoner, Okl., on the brief), for appellees.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. This action is one by a beneficiary of an express trust for an accounting by two of his three trustees. He asks no relief against Minerva

Jones, his mother; and the third trustee is not in court. The Citizens' National Bank was joined as an alleged custodian of trust property, but the proof did not so develop, and the bill was properly dismissed as to it. After hearing the plaintiff's evidence, the trial court dismissed the bill. The trial court stated that the fees exacted by the trustees for themselves and counsel employed by them were exorbitant and unwarranted, but he felt that the defendants had successfully avoided an accounting because of certain releases which they procured from the plaintiff. This appeal challenges the correctness of that decree.

The evidence developed this state of facts: The plaintiff is a Creek Freedman, and the owner of valuable oil lands. Prior to his majority, July 30, 1924, his properties were managed by guardians.

About 15 months prior to his coming of age, Lewis and Wesley, who later became two of his trustees, advised the plaintiff to move from Oklahoma to Washington, D. C., which he did; during his residence there, Wesley repeatedly wrote the plaintiff that he was engaged in protecting the plaintiff from crooks who were undertaking to get hold of his property. In November, 1923, the plaintiff made a will, at the suggestion of Wesley, making Lewis and Wesley his executors. About six weeks prior to the plaintiff coming of age, Wesley came to Washington and suggested that he and the plaintiff take a trip to Europe, so that the plaintiff would be out of reach of the crooks and grafters when he came of age. Wesley and the plaintiff went to Europe, the plaintiff not knowing who paid the expenses of the trip. They returned to this country just prior to the plaintiff's birthday, and on the morning of his twenty-first birthday, at Cleveland, Ohio, Mr. Wesley and Mr. Lewis presented to the plaintiff about 25 or 30 documents for plaintiff to sign. He had no other advice, but he had implicit confidence in Mr. Wesley. He signed these instruments without reading them and without any understanding of what they contained, excepting that he would be protected in the enjoyment of his property for 21 years, out of which he would get $200 a month. On the trip to Europe no mention had been made of these instruments, and at the time of the execution of them, Wesley and Lewis said they were in a hurry to get back to Oklahoma.

Among these instruments was a deed of trust, conveying all of his properties to Wesley and Lewis and his mother, Minerva Jones, in trust for a period of 21 years. The trustees were given the broadest and most comprehensive powers, and the trustees were to receive a reasonable compensation for their services, to be determined from time to time by the trustees and the plaintiff.

Among the instruments signed that day was one authorizing Wesley and Lewis to pay immediately to P. A. Lewis the sum of $5,000, "in consideration of money advanced by the said P. A. Lewis"; and to pay to the law firm of Wesley, Atkins & Chandler, the sum of $15,000 "as payment for legal services rendered to my estate and on behalf of my mother from March, 1923, to July, 1924." Prior to that morning, the plaintiff's estate had been administered by a Court of Probate in Oklahoma. The defendant Lewis, in his answer, admits that the sum of $15,000 was paid under such authority, but alleges that it was in payment for services rendered after the plaintiff had attained his majority, which was but a few hours prior to the execution of the authority.

The trustees came into the possession, management and control of the plaintiff's properties under such deed of trust. There was evidence that Lewis was one of the trustees of another trust, called the Tucker trust, and that as trustee for the plaintiff he had purchased from himself as trustee of the Tucker trust, mortgages in the amount of $11,000, to the detriment of the plaintiff's interests. There was also evidence that from September 8, 1924, the date the trustees came into the possession of the property, until March 1, 1926, the date they turned it over, they had received in cash a total sum of $180,513.68, from which there was paid to Wesley and Atkins the sum of $59,624.57, and to the defendant Lewis the sum of $20,658.56. That the net cash balance turned over to the plaintiff upon the termination of the trust was the sum of $496. There was other evidence which it is unnecessary to relate.

The existence of the trust imposed upon the trustees the duty of an accounting. Dillman v. Hastings, 144 U. S. 136, 12 S. Ct. 662, 36 L. Ed. 378; Irvine v. Dunham, 111 U. S. 327, 4 S. Ct. 501, 28 L. Ed. 444; 26 R. C. L. 252; 39 Cyc. 464. Unless the matters hereafter referred to relieve the defendant Lewis from this obligation, the burden is upon him to account to the plaintiff for all properties received by the trustees, and for the disposition thereof.

The defendant Lewis asserts, and the trial court has found, that he is relieved from this

primary obligation to account, by virtue of certain transactions, concerning which the plaintiff's evidence showed:

That the properties of the plaintiff were in Oklahoma, and the trust was being there managed; that the plaintiff lived in Ohio, and knew little or nothing concerning the administration of his property, excepting such information as he received from his trustees, and that he was getting his $200 a month. That early in February, 1926, one Knight came to Ohio and advised the plaintiff that his trustees were robbing him, and urged the plaintiff to execute a second trust; he persuaded the plaintiff to go to St. Louis, where he met one Mr. Alcorn and one Mr. Capps, who gave the plaintiff $500, and who induced him to execute a second trust to them as trustees, which they said would terminate the first trust. It also appears that Capps and Alcorn instituted for the plaintiff in the state court of Oklahoma a suit against Wesley and Lewis. The petition in this case does not appear in the record, but from the evidence it appears to have been a suit charging Wesley and Lewis with breaches of trust. This second trust was executed and the suit filed on the 12th of February, 1926. Receivers were appointed by the state court in this suit. Immediately, Wesley and Atkins negotiated with Capps and Alcorn for a settlement of the litigation. It was finally agreed between Capps and Alcorn on the one hand, and Wesley, Atkins and Lewis on the other, that Wesley and Atkins should receive for services to date the total sum of $11,500, and Lewis should receive the sum of $5,000; Wesley and Atkins were to continue certain litigation, but the first trust should be terminated. A tentative agreement of settlement, along such lines, was prepared and dated on February 13, but was not executed. It was agreed that Alcorn and Atkins should go to St. Louis and there meet the plaintiff, and endeavor to execute such settlement.

In the meantime, the plaintiff received a telephone call from his mother in Oklahoma, advising him that he had made a mistake in the execution of the second trust. The plaintiff became alarmed and consulted the superintendent of his school, who advised him to consult with one Chandler, then practicing law in Ohio, and formerly a member of the Wesley and Atkins law firm. Chandler at that time had confidence in Wesley and Atkins. Chandler advised the plaintiff to get rid of the second trust, if possible, and Chandler communicated with Wesley in Oklahoma, and a conference was arranged for St. Louis on February 15. The purpose of the conference was to devise a method to undo the mistake which the plaintiff was convinced he had made in the execution of the second trust. The meeting was held in St. Louis on February 15.

A meeting in St. Louis had been arranged for the purpose of ratifying the tentative agreement between Wesley and Atkins and Lewis on the one hand, and Mr. Capps and Mr. Alcorn on the other. Consequently, Mr. Alcorn went to St. Louis with Mr. Atkins for that purpose. But between the 13th and 15th of February, Wesley and Atkins had learned that plaintiff was ready to repudiate the second trust; Wesley then telephoned Chandler to remain with the plaintiff, and to bring him to St. Louis, and stated that he would pay Chandler for his trouble if the plaintiff would not. Chandler and plaintiff came from Ohio to St. Louis for the meeting; and Atkins and the mother of plaintiff and Alcorn came from Oklahoma. Atkins, however, prevented Alcorn from meeting plaintiff, by telling Alcorn that the plaintiff had not arrived, and by keeping Alcorn busy trying to locate the plaintiff. Alcorn went back to Oklahoma still believing that the plaintiff was not in St. Louis. But Atkins and the plaintiff and Chandler were in conference that day. It was agreed that the plaintiff had been imposed upon in the execution of the second trust and by the institution of the state court suit, and that plaintiff and Chandler and the trustees should "center their fire on Alcorn and Capps." The record does not show whether the plaintiff or Chandler knew what was contained in the state court action, which had been filed two or three days before by Capps and Alcorn for the plaintiff. Chandler did not even know the case had been filed until Atkins advised him in St. Louis, and the evidence seems to show that the only information either Chandler or the plaintiff had about it was such as they received from Atkins. Atkins told the plaintiff that unless he caused the state court action to be dismissed with prejudice, that the trustees would keep his property tied up indefinitely. The plaintiff agreed to co-operate with them in getting rid of the second trust. At that time the plaintiff had no knowledge of any malfeasance on the part of the trustees. He expressed his willingness to do anything that Atkins wanted him to do. Thereupon, Atkins suggested that he employ Chandler and another attorney to dismiss the state court action and to bring another action against Capps and Alcorn for damages.

That day in St. Louis, the plaintiff executed and delivered to Atkins a document en-

titled "Repudiation and Dismissal" and entitled in the state court suit. That instrument recited that the suit was brought without his authorization; that the charges of fraud, duress and deceit against his trustees were false and untrue, and made without his knowledge and consent; and requested the court to dismiss the action with prejudice. At the same time he executed a written instrument employing Chandler and one Vaughn, as his attorneys to dismiss the suit brought by Alcorn and Capps, and to bring such actions as they might deem best to set aside the second trust, and agreeing to pay such attorneys for such services.

Thereupon, Atkins returned to Oklahoma and the plaintiff and Chandler returned to Ohio.

The dismissal of this action cannot in any event bar the plaintiff from his action against the trustees for the sums of money appropriated by them thereafter. Moreover, if the plaintiff's evidence is believed, the execution of this dismissal with prejudice was attended by a threat on the part of Atkins that if he did not execute the same, he and his associates would keep the plaintiff's property tied up indefinitely.

In the conference on February 15, Atkins had stated that the trustees were willing to turn the plaintiff's property back to him freed from the trust. The February 15th meeting had cleared the way for the disposition of the controversy with Capps and Alcorn, and Atkins returned to Oklahoma, where a settlement was negotiated with Capps and Alcorn by the payment to them of the sum of $2,000, and all the litigation was disposed of. Thereupon, the plaintiff and Chandler, then in Ohio, were advised by Atkins to meet the trustees in St. Louis for the purpose of completing a return of the property from the first trustees to plaintiff. This meeting was held on February 23. After disposing of some preliminary matters, Mr. Atkins presented to the plaintiff deeds to certain properties amounting in value to $9,200, made to the trustees and their attorneys as compensation for their services. The plaintiff executed and acknowledged such deeds. When the plaintiff had signed such deeds, Atkins told the plaintiff that the trustees were willing to turn his property back to him, provided plaintiff would consent to the payment to them of a sum in excess of $35,000 in cash, in addition to the properties mentioned. He said the trustees had allowed those sums to themselves and their attorneys on February 20, 1926, and presented to the plaintiff the minutes of the trustees' meeting and directed him to sign it. This was the first intimation that either plaintiff or Chandler had that fees far in excess of the sum of $16,500, theretofore agreed on between Alcorn and the trustees, were to be exacted. The plaintiff objected. Whereupon Atkins replied: "Well, it don't make any difference whether you sign or not, the trustees have agreed to it and furthermore you have dismissed this suit with prejudice and you cannot bring suit against us any more. We are not going to turn over your property to you until you do sign it." Whereupon plaintiff signed. Atkins also presented to him checks already made out to the trustees and their attorneys for such sums which the plaintiff also signed. Then Atkins stated that they could not turn the property over that day, which was the purported purpose of the meeting in St. Louis, but that it would be necessary for them to prepare numerous documents, and advised the plaintiff and Chandler to return to Cleveland and to come to Oklahoma later for the purpose of getting the property. This was done. Chandler returned to Oklahoma on March 1st for the purpose of receiving the properties. At that time Wesley advised Chandler that in dealing with the plaintiff he should charge plaintiff for his services when he started, charge him as he went along, and when he was finished add it all up and charge him again. Wesley also stated that the plaintiff could not effectively sue the trustees, for they had his money where no court could reach it. In checking over the accounts, Chandler noticed several matters which he thought should be explained, but Wesley declined to give any explanation, and said that they would not deliver the property until the plaintiff had signed a release in full. The plaintiff could not receive the income from his oil properties without the trustees signing a division order on the pipe line company. Thereupon Atkins went to Ohio with Chandler where Atkins presented to the plaintiff for signature a release and discharge from any and all liability. Atkins told the plaintiff that unless he signed that release, they would not turn over any of his property to him, nor sign a division order on the pipe line company, and would use his own money to fight him with. The cash in the estate was so thoroughly depleted that unless he could receive some income from his own property, he would have no funds to live upon or with which to employ counsel. Thereupon the plaintiff signed the release, which on the face of it is a complete discharge from any and all liability.

The law involved is not difficult nor in controversy. While a primary obligation of a trustee is to account to his beneficiary, that accounting need not be in court. If he fully and fairly discloses his stewardship, and his beneficiary, understandingly and voluntarily, agrees to its correctness and releases his trustees, the courts will not interfere. 39 Cyc. 466; 26 R. C. L. 1376. But if the releases are exacted by coercion or duress, or induced by fraud, equity will set them aside and require an accounting in court. Lanigan v. Scharton, 238 Mass. 468, 131 N. E. 223; 2 Pomeroy's Eq. Jur. (3d Ed.) § 928. Furthermore, equity scrutinizes closely dealings between a trustee and his beneficiary which either inure to the benefit of the trustee, or excuse him from his fundamental obligation to account. Adams v. Cowen, 177 U. S. 471, 20 S. Ct. 668, 673, 44 L. Ed. 851; Riggs v. Gillespie (4 C. C. A.) 241 F. 311; Comstock v. Herron (6 C. C. A.) 55 F. 803, 810; Thaw v. Thaw (2 C. C. A.) 27 F.(2d) 729; Jordan v. Jordan, 94 Conn. 384, 109 A. 181, 519.

In Adams v. Cowen, supra, Mr. Justice Brewer said:

"While a man in the full possession of his faculties and under no duress may give away his property, and equity will not recall the gift, yet it looks with careful scrutiny upon all transactions between trustee and beneficiary, and if it appears that the trustee has taken any advantage of the situation of the beneficiary, and has obtained from him, even for only the benefit of other beneficiaries, large property without consideration, it will refuse to uphold the transaction thus accomplished. Taylor v. Taylor, 8 How. 183, 12 L. Ed. 1040; Comstock v. Herron, 55 F. 803, 5 C. C. A. 266, 6 U. S. App. 626–637, and cases cited; 1 Story's Eq. Jur. §§ 307, 308; 2 Pomeroy's Eq. Jur. §§ 951, 958, 1088. So, without considering the debatable questions presented in respect to this receipt or release, we are of opinion that the Circuit Court of Appeals was right in refusing to uphold it."

And in Comstock v. Herron, supra, it is held:

"The rule which requires clear proof to warrant the conclusion of a waiver of a substantial right is especially applicable to those holding fiduciary relations. When a trustee, holding a position of power and influence over the cestui que trust, sets up against that party, for the benefit of others, an estoppel precluding the assertion of a right created by the trust, and that estoppel is founded upon a transaction between the beneficiary and himself, he must be expected to produce quite satisfactory proof that the party proposed to be estopped came freely, and with full understanding of his rights, into some inconsistent arrangement, of tangible form and certainty. Nothing less than this should satisfy the court. Wheeler v. Smith, 9 How. 55 [13 L. Ed. 44]; Lloyd v. Attwood, 3 De Gex & J. 614 (judgment of Lord Justice Turner); Aspland v. Watte, 20 Beav. 474; Walker v. Symonds, 3 Swanst. 1."

A purported release which takes the form of a judgment of dismissal of another action, entered without judicial inquiry, stands on no higher plane than any other release. Such a judgment cannot be collaterally attacked, nor can errors occurring in its rendition be corrected in another action; but equity may disregard its effect as a release, if the dismissal was procured by the trustee in violation of his duties to his beneficiary. Seay v. Hawkins (8 C. C. A.) 17 F.(2d) 710; Jefferson v. Gypsy Oil Co., (8 C. C. A.) 27 F.(2d) 304; Horton v. Stegmyer (8 C. C. A.) 175 F. 756, 758, 20 Ann. Cas. 1134. In the latter case, Judge Sanborn (Van Devanter and Munger concurring) laid down this rule:

"A federal court sitting in equity has jurisdiction to disregard or to enjoin the enforcement of an unconscionable judgment of a state or of a national court for new causes, such as fraud, accident, or mistake, which deceive the court into a wrong decree, or which prevent the judgment defendant from availing himself of a meritorious defense that was not fairly presented to the court which rendered the judgment. But it has no power to take such action on account of errors or irregularities in the proceedings on which the judgment or decree is founded, or an account of erroneous or illegal decisions by the court which rendered the judgment or decree. The reason of this rule is that cases of the former class present new controversies, which have never been raised in other courts, while cases of the latter class invoke a jurisdiction which does not exist, a jurisdiction in a federal court to review and revise the acts and decisions of courts of co-ordinate jurisdiction upon questions which they have lawfully considered and adjudged."

It is legal duress for a trustee to refuse to turn over property to his beneficiary rightfully entitled thereto, except upon condition of signing a release. An analogous case is Lanigan v. Scharton, 238 Mass. 468, 131 N. E. 223, in which an attorney exacted a release of an exorbitant fee, before he would turn moneys to his client. The release was set

aside. See, also, Stenton v. Jerome, 54 N. Y. 480. In Radich v. Hutchins, 95 U. S. 210, 213, 24 L. Ed. 409, this definition occurs:

"To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary,—treating now the redemption of the cotton as made in money, goods being taken as equivalent for a part of the amount,—there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment. As stated by the Court of Appeals of Maryland, the doctrine established by the authorities is, that 'a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid.' Mayor and City Council of Baltimore v. Lefferman, 4 Gill (Md.) 425 [45 Am. Dec. 145]."

And in Lonergan v. Buford, 148 U. S. 581, 590, 13 S. Ct. 684, 37 L. Ed. 569, a plaintiff executed a release because "It was apparently the only way in which possession could be obtained, except at the end of a lawsuit, and in the meantime the property was in danger of loss or destruction." The release was set aside.

■ The appellee expressly "admits the authorities cited by appellant state [the] correct rule" that a trustee bears the affirmative "burden of proving that all of the transactions herein complained of were fair, voluntary, free from oppression or undue influence, and that the results of same were fair." Appellee contends that the rule does not apply where the cestui and the trustee have assumed an hostile attitude toward one another, and where the cestui has independent advice. Without stopping to inquire as to the limits of this rule, the facts adduced do not warrant its application. When the state court suit was dismissed with prejudice there was no hostility; on the contrary, all were working together to get rid of the second trust. Moreover, the $35,000, and the other property valued at $9,200, had not been appropriated. A week later, plaintiff's consent to the payment of these sums was procured by a threat to withhold his property from him. That was the inception of the hostility after the previous reconciliation. The exorbitant charge, coupled with the duress, occasioned the hostility. Such hostility cannot be used as a defense to the duress. As to the independent advice of Chandler: There is some doubt as to whether he was originally working for the plaintiff or the trustees, but assuming his employment by plaintiff, his employment until after February 23rd was a limited one, to get rid of the second trust. He was working with Wesley and Atkins and not against them. He was not then employed to negotiate a settlement between plaintiff and his trustees. When Atkins suddenly demanded, on February 23rd, that plaintiff authorize the payment of $35,000 and transfer properties to them, Chandler was not consulted. He was in the room, but that was not his affair. He was acting in plaintiff's interest, and employed for that purpose, when he advised plaintiff to sign the release of March 4th. But the damage was then done. The trustees and their counsel had all the cash in the estate except $496. They could cut off plaintiff's income indefinitely by refusing to turn over his property or sign division orders. If the evidence adduced is true, plaintiff had the choice of signing or starving. Such a release falls squarely within the two decisions of the Supreme Court above cited.

The object of this suit is an accounting. A trustee should be not only willing but anxious to account to his beneficiary. The circumstances as shown by plaintiff's case tend to prove a lack of good faith. The procural of this comprehensive trust on the morning of his twenty-first birthday, without independent advice; the procural of an authorization to pay them forthwith $20,000 in cash, and the inconsistencies between the authority and the answer filed herein; the purchase of securities from themselves; the agreement on February 13th to accept $16,500 as compensation and a week later exacting nearly $45,000; the fact that for 17 months' service, they paid themselves on one account or another, a princely income of more than $80,000, while plaintiff and his mother were receiving a pittance; the devices used to keep plaintiff and Alcorn apart in St. Louis; these and many other circumstances lead to the conclusion that plaintiff is entitled to have his case tried. If the trial court, from all the evidence, finds that the plaintiff has understandingly, voluntarily, and without duress or unfair means, relieved the defendant Lewis from his obligation to account, the defendant then need not account. Otherwise, he must. But it cannot be said, from this record, as a matter of law, that the trustees have been so relieved.

The questions suggested in the briefs, as to the liability of Lewis for the acts of his

co-trustees, or for payments made to counsel employed by the trust, or whether the trustees are entitled to any compensation, should be left until all the evidence is in and the facts found.

The decree as to defendant Lewis will be reversed and the case remanded for further proceedings in accordance with this opinion. The decree as to the Citizens' National Bank and Minerva Jones is affirmed.

Reversed in part.