COWEN et al. v. ADAMS et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1897.)

No. 367.

1. SUIT UNDER WILL—NECESSARY PARTIES—LEGATEES.
   One M. made his will, in 1880, leaving his estate to be equally divided among his four children and a grandson, the son of a deceased child. The will also referred to advances made by the testator to his children, and charged to them on his books, and declared that the provision made by the will was to be in addition to such advances, and that, in the settlement of his estate, such advances already made, and any that should be afterwards made, should not be treated as advancements, but as gifts, not in any manner to be accounted for by the children or grandson. Some time after the making of this will, W., one of M.'s sons, met with financial disaster, and became very deeply involved. M. then directed J., another son, to do what was necessary to relieve W., and thereafter, through J., advanced very large sums to pay W.'s debts, taking W.'s notes therefor, and taking assignments of collateral from some of W.'s creditors. Shortly before the death of M., and when it was expected, the persons who afterwards became administrators with the will annexed took from W. a paper authorizing the application of his share of his father's estate to these notes. This paper W. afterwards revoked, and then revoked the revocation, and afterwards gave the administrators a receipt for nearly the whole amount of his share of the estate by its application to the payment of the notes, and thereafter he received the remaining collaterals, taken by his father when he paid W.'s debts, and which had not been realized on by him. In the meantime, in a suit instituted against W. by his wife, a decree had been entered, pursuant to which he conveyed to trustees, for the benefit of his family, all his interest in his father's estate. The trustees under this deed brought suit against the administrators executing M.'s will to set aside the receipt given to them by W., to establish W.'s right to his interest in his

father's estate, and for an accounting thereof. *Held*, that the legatees under M.'s will were not necessary parties to the suit, either as it was thereby sought to set aside W.'s receipt or as it was sought to establish W.'s interest in the estate notwithstanding the advances to him.

2. CONSTRUCTION OF WILL—ADVANCES.

*Held*, further, that the dominating purpose of M.'s will was that the property he should leave at his death should be equally divided among his children and grandchild, irrespective of previous advances, and, while a debt from a legatee might be created which would be independent of the absolution accorded by the will, to establish the creation of such a debt would require clear proof of the existence of a distinct purpose on the part of the testator himself, at the time of the transaction, to put such debt outside the pale of the forgiveness written in the will, and that the advances made to W., for which his notes were given, though debts during M.'s life, were not shown by the evidence to be outside the provisions of the will, and they were extinguished on M.'s death.

3. ESTOPPEL—LEGATEE'S RECEIPT.

*Held*, further, that the receipt of the collaterals, to which he became entitled upon the extinguishment of his debt, did not estop W. to dispute the receipt given to the administrators, and that, in view of the position of trust in which the administrators stood towards W., the receipt procured by them from him, by which, without legal obligation to do so, he surrendered the greater part of his share of the estate, would not be permitted to stand in the way of the enforcement of his rights in the estate of M.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This is a suit in equity brought in the circuit court for the district of Kentucky, by the above-named Benjamin R. Cowen, Evan P. Williams, and A. S. Frazer, appellants, as trustees under a deed of trust executed by William Means on the 26th day of December, 1891, and which purported to convey all the interest of the said William Means as devisee under the will of his father, Thomas W. Means, in trust for the purposes recited in a certain decree of the court of common pleas of Greene county, Ohio, against the defendants Thomas M. Adams and E. C. Means, as administrators with the will annexed of the estate of Thomas W. Means, and John Means, who had been connected with the transactions out of which the controversy grows. As the appeal is not prosecuted as against John Means, it is not necessary here to state the particular relationship of John Means to the subject-matter of the suit in respect to his liability to account. The object of the suit is to set aside a certain instrument of settlement and receipt given by William Means to the above-named administrators on the 16th day of October, 1890, and for a declaration establishing the right of the said trustees to recover, in virtue of the interest of William Means as legatee, a one-fifth interest of the estate of the said Thomas W. Means, and for an accounting and payment to them of the amount of the legacy bequeathed to the said William Means.

In order to a proper understanding of the grounds of the decision of this court, it is necessary to give a brief account of so much of the history of the prior events and of the transactions involved in the controversy as are deemed by the court material, supplemented, however, by some further incidental facts which are stated in the opinion. Thomas W. Means was on the 20th day of July, 1880, and for many years prior thereto had been, a resident of Hanging Rock, in the state of Ohio, and had reached the age of 77 years. He had been an active and capable man, engaged in many kinds of business enterprises, and had accumulated a large property, amounting to $700,000 or $800,000. He had had five children,—John, William, Mary, Margaret, and Sarah,—the latter of whom had married one Culbertson. Previous to the date just mentioned, Mrs. Culbertson had died, leaving her son, Thomas M. Culbertson, as her only heir. These five persons, the four children and the grandson, were all living at the date referred to. Prior to that time he had been in the habit of assisting his children, and in that way had already advanced to them large sums of money. He had opened accounts with each of them, in which he had charged them with the sums which he had furnished them,

and given them credit for various items to which he had conceived them entitled for the purpose of keeping these accounts. He had assisted some of his children in business, introducing them into various enterprises in which he was himself concerned, and, when such enterprises had been disastrous or unprofitable, had charged off the losses to himself, or furnished them with the means to balance up their losses and take a fresh start; his purpose seeming to have been, while he lived, to take upon himself such burdens, and help them along through their misfortunes and discouragements. At one time, on December 9, 1873, he made a gift to his children of $400,000, $80,000 to each. Previous to that time he had advanced them, in all, more than $250,000. Without for the present going into further particulars of this kind, Thomas W. Means, on the said 20th day of July, 1880, made and executed his last will, the fourth and fifth paragraphs of which are here given:

"(4) I give, devise, and bequeath all the residue and remainder of my estate, personal, real, and mixed, wherever situated or located, of which I shall die possessed, to be equally divided among my four children, John Means, William Means, Mary A. Adams, and Margaret A. Means, and my grandson, Thomas M. Culbertson (son and sole heir of my deceased daughter, Sarah Jane Culbertson), who shall be living at the time of my decease, and the issue of any child now living, and of said grandson, who may then have deceased, such issue taking the share to which such child or grandson would be entitled if living. But said share given, devised and bequeathed to said grandson or his issue is to be held in trust as hereinafter provided, and to be subject to the provisions hereinafter contained as to said grandson's share.

"(5) I have made advances to my said children which are charged to them, respectively, on my books, and I may make further advances to them, respectively, or to some of them, and to my said grandson, which may be charged on my books to their respective accounts. I desire the equal provision herein made for said children, and the provision for said grandson, to be a provision for them, respectively, in addition to said advances made and that may hereafter be made, and that, in the division, distribution, and settlement of my said estate, said advances made and that may hereafter be made be treated, not as advancements, but as gifts, not in any manner to be accounted for by my said children and grandson, or any of them."

After the making of this will the testator continued to make advances to his children, and to keep regular accounts with them, as he had previously done. To some of them he advanced very considerable sums, thus: To John Means he supplied $20,685; William Means, $41,590; Mary A. Adams, $48,792; Margaret A. Means, $55,568. These, with former advances, made up the sum of $100,000 to each, exclusive of the $80,000 which, as above stated, he had given to each of them. No advances appear to have been made to the grandson, Culbertson, the reason probably being that he was a minor, and perhaps, also, because he had other resources, on his paternal side. John Means, the oldest son, was himself a prosperous man, and acquired a considerable fortune. William established himself in Cincinnati, and became a man of distinction there, being at one time mayor of the city. He became president of the Metropolitan National Bank, one of the leading financial institutions of the city. He acquired, and for many years maintained, the reputation of being a sound and capable business man. But the Metropolitan National Bank, which had for some time been laboring under heavy embarrassments resulting from mismanagement and irregular dealings with its funds by the president, became so much involved that in February, 1888, it failed, and directly went into the hands of a receiver. By reason of his defalcations as trustee for large properties, and of his irregular transactions in the affairs of the bank, William Means became deeply involved, not only with respect to his character and standing as a man, but also in respect to his financial affairs. Proceedings, both civil and criminal, were threatened, and were imminent. While he had large and valuable collaterals, they could not be presently realized upon, and, if they could have been realized in full, they would have been scarcely sufficient to have met his liabilities. In this state of affairs he turned to his father, who in 1884 had removed to Ashland, Ky., for help. The latter summoned to his counsel John Means, his other son, and, after considering the ways and means of helping William out, he sent John to Cincinnati to investigate affairs, and do what should be found needful to relieve William in his embarrassed situation. The result was that, on its being ascertained that Wil-

liam's indebtedness to the bank amounted to the sum of $125,911.74, John Means paid to the bank that sum, and took an assignment to Thomas W. Means of all the collaterals which the bank held as security therefor, amounting, in all, at their par value, to the sum of $182,350,—their estimated salable value being $146,000. This was on February 15, 1888. On the following 22d day of February, at John's request, William Means executed his promissory note to Thomas W. Means for the sum of $125,911.74, which John had paid to the bank. The following is a copy of the note:

"Cincinnati, O., Feb. 15, 1888.

"Due Thomas W. Means, or order, one hundred and twenty-five thousand nine hundred and eleven and $74/100$ dollars, with interest from date.

"$125,911.74.                              William Means."

On the 11th day of March, 1888, John Means paid for William Means, to the Bank of Ashland, $15,027, to take up two notes, given by William Means, for which the Bank of Ashland held collaterals of the par value of $22,000, which were transferred to Thomas W. Means, and William Means thereupon executed to Thomas W. Means his promissory note therefor, as follows:

"Yellow Springs, O., March 19, 1888.

"One day after date I promise to pay to the order of Thomas W. Means fifteen thousand and twenty-seven dollars, for value received.

"15,027.00.                               William Means."

On August 20, 1888, Thomas W. Means took up a note of William Means for $5,000, and William Means sent to Thomas W. Means his note for that amount, with some accrued interest, as follows:

"New York, August 20, 1888.

"One day after date I promise to pay to the order of Thomas W. Means five thousand forty-one and $67/100$ dollars, for value received.

"$5,041.67.                               William Means."

Another transaction of like character was the payment by Thomas W. Means to Hunt & Gurkey of the sum of $2,100, for which, on October 24, 1888, William Means executed the following note:

"New York, October 24, 1888.

"One day after date I promise to pay to the order of Thomas W. Means twenty-one hundred dollars, for value received.

"$2,100.                                  William Means."

At this stage of affairs, there appears to have been some scheme concocted for obtaining a nolle prosequi in reference to the criminal prosecution which had been commenced in the federal court on account of William Means' transactions in the affairs of the bank, or of obtaining a pardon therefor. In furtherance of this scheme, a note for $75,000 was made by William Means to Thomas W. Means, as follows:

"New Haven, Conn., November 9, 1888.

"One day after date I promise to pay to the order of Thomas W. Means seventy-five thousand dollars, value received, with interest from date.

"$75,000.                                 William Means."

Appended to this note was the following:

"It is agreed, as part of the transaction by which I have procured a loan of seventy-five thousand dollars upon the foregoing note, that the amount thereof, and all the interest, shall be paid from my interest as devisee or distributee of the estate of Thomas W. Means.

"November 9, 1888.                          William Means."

Exactly how this $75,000 was intended to be used does not appear. It is not shown that the money was actually employed, and the scheme was either not pursued or fell through. William Means was tried upon the indictments in the United States district court at Cincinnati and acquitted. On the 22d day of November, 1888, another note was executed by William Means to Thomas W. Means for the sum of $45,000, as follows:

"$45,000.                                 New Haven, Conn., November 22, 1888.

"One day after date I promise to pay to the order of Thomas W. Means forty-five thousand dollars, for value received, with interest from December 1, 1888.
                                                            "William Means."

Appended thereto was the following:

"The above is for money loaned to me by Thomas W. Means, on account of my indebtedness as executor and trustee of the estate of A. Labrot, deceased, and it is agreed, as part of the transaction by which I have procured a loan of forty-five thousand dollars upon the foregoing note, that the amount thereof and all interest shall be paid from my interest as devisee or distributee of the estate of Thomas W. Means.

"November 22, 1888.                                     William Means."

John Means was acting as the agent of his father in all of these transactions, and used his father's funds in making the payments on account of which the notes of William Means were given. Certain correspondence took place between John Means and William Means, during the pendency of these transactions, in relation to the giving of the above-mentioned notes by William Means, and the form in which they were put, to which the appellants refer as explanatory of the purpose for which the notes, and the stipulations at the end of some of them, as above shown, were made. This correspondence is referred to in the opinion. Thomas W. Means, already 85 years of age, had, in 1888, become almost blind, and that affliction was increasing upon him. He was somewhat enfeebled in mind, and quite infirm, and by June, 1889, had become quite imbecile. He had, up to that time, at least, had a general understanding of what was being done for William, and approved of it. He was deeply troubled at the calamities which had befallen his son, and felt a deep interest in relieving him. Soon after the above-mentioned transactions in aid of William were begun, John Means, with the assent of his father, opened up a separate account in his father's books, in his own name as debtor, with reference thereto, in which were recorded the substance of the matters of account involved, and in this separate account John Means continued the record of the transactions.

Thomas W. Means died June 8, 1890, and on the 28th day of the July following his death Thomas M. Adams and E. C. Means were appointed administrators with the will annexed. These persons—Thomas M. Adams and E. C. Means—had, a short time previous to the testator's death, obtained from William Means the following instrument:

                                            "Ashland, Ky., June 16, 1890.

"I hereby direct the executors of the will of Thomas W. Means, or the personal representatives hereafter to be appointed, to charge against my distributable share as heir at law of Thomas W. Means, or as devisee under his will, the notes heretofore given by me to Thomas W. Means; and I do further hereby assign such interest or share, or sufficient thereof to pay and discharge such notes.
                                                      "William Means.

"Witness:
  "S. B. E. Dranan.
  "James Means."

On the 17th, the day following, William Means delivered to the said Thomas M. Adams and E. C. Means the following paper:

                                            "Ashland, Ky., June 17, 1890.

"To Whom It may Concern: This is to certify that my object in signing a certain paper, dated June 16, 1890, in which the executors of the estate of Thomas W. Means are directed to charge up my obligations against my interest in said estate, was done to insure the estate against loss through the purchase of such obligations, no matter how obtained, and for no other purpose whatever.
                                                      "William Means."

On the 28th day of July (although it bears date the 29th), Thomas M. Adams and E. C. Means, under appointment as administrators, indorsed upon the back of the paper above set forth, bearing date June 16, 1890, the following:

"This paper came into the possession of the undersigned June 16, 1890, and has been held jointly since. And now, as administrators with will annexed of Thomas

W. Means, deceased, and upon our appointment and qualification as such, we note and indorse hereon its delivery and acceptance to and by us.

"E. C. Means,
"T. M. Adams,
"Administrators with Will Annexed of Estate of Thomas W. Means.
"July 29, 1890.
"Attest:
"John F. Hagar.
"W. P. Seaton."

Then, also, on the day of the appointment of the administrators, July 28th, William Means delivered to the administrators an instrument of revocation, as follows:

"To the Executors and Legal Representatives of the Estate of Thomas W. Means, Deceased, and to E. C. Means and Thomas M. Adams, Individually:

"Gentlemen: Inasmuch as, by a certain paper, dated June 16, 1890, it is claimed that I authorized certain notes to be deducted from or charged against my distributable share as heir at law of Thomas W. Means, and further assigned certain interests to pay said notes: Now, this is to notify you, and all other persons interested herein, that I hereby revoke and annul said paper writing, and all consent and authority conferred by it, and declare said paper to be null and void for any purpose whatever. And you are notified not to deliver said paper to any person, or make any use of the same; and I make this notification for the following, among other, reasons: (1) That said paper was not to be delivered without my consent. (2) Said paper was wholly without consideration and inoperative for any legal purpose. (3) Said paper was signed without legal advice or proper information as to the contents or meaning. (4) Said paper was obtained from me in ignorance of important facts and of my legal rights. (5) Said paper was obtained under circumstances that make it inequitable that I shall be bound by it. (6) Said paper was not intended to be used in any manner against my interests or desire.

"Yours, respectfully,                                              William Means.
"Ashland, Ky., July 28, 1890."

On October 4th following, William Means revoked his revocation of July 28th, by the following indorsement upon the margin thereof:

"To E. C. Means and Thomas M. Adams, Administrators with the Will Annexed of Thomas W. Means:

"The matter of revocation contained in this notice and paper are hereby revoked.
"October 4, 1890.                                              William Means.
"Attest:
"John F. Hagar."

On the 16th of October, William Means gave the administrators the following receipt:

"Ashland, Ky., October 16, 1890.
"Received of Thomas M. Adams and E. C. Means, administrators with the will annexed of the estate of Thomas W. Means, deceased, the sum of one hundred and thirty-six thousand and thirty five and seventy-five one-hundredths dollars. being a part of my distributable share as legatee under said will, applied by them, as ordered by me, upon the following notes and claims owed by me to the estate of said decedent, and payable to his order, viz.: [Here follows description of 10 notes, with balance due on each, aggregating $136,035.75.]    This receipt is given in pursuance of settlement made October 16, 1890.                          William Means.
"Attest:
"John F. Hagar.
"A. E. Lampton."

On the same day, the administrators took from William Means a further receipt, which was dated the 17th, and changed to the 18th, for the sum of $26,240.79, as a part of his share in the estate, the money to be paid to his brothers and sisters on account of antecedent debts, if there should be enough left for the purpose, after paying the above-mentioned 10 notes. It appears that the sisters

were unwilling to carry out this part of the proposed arrangement, and the receipts were returned to William Means by the administrators shortly afterwards. On October 23, 1890, William Means received from E. C. Means the notes of William Means, which had been taken up from the Metropolitan National Bank, February 15, 1888, amounting to $125,911.74, and received, also, certain collaterals, which had been taken by John Means for his father at the time when he paid William Means' obligations.

There is evidence tending to show that William Means, at the time when he signed the instrument of October 16th, was induced to do so by the expectation that he would in some way get the expected surplus of $26,240.79, which was, at about the same time, receipted for by him to be paid to his brother and sisters, as above mentioned; but the evidence does not disclose very clearly in what way this was to be accomplished. The appellants introduced evidence, which, they claim, tends to show that, some time in February, 1890, William Means, having fallen into a pecuniary controversy with his wife and children (more particularly his wife), and being pressed for a settlement upon them, with the intention of satisfying such claims and reconciling their differences, entered into an agreement whereby he undertook to assign and transfer to them his expectancy in his father's estate. It appears, from the proof in the case, that a suit was commenced in the court of common pleas of Greene county, Ohio (where the wife and children then resided), by them, against William Means, for the purpose of compelling the specific performance of such an agreement as having been made in 1890. Process was served upon William Means, but he did not defend the suit. The case was heard upon the pleadings and proof introduced before the court, and thereupon a decree was rendered, finding the existence of the agreement above mentioned, and substantially decreeing a specific performance thereof, and directing the defendant, William Means, to execute a deed of trust, conveying his expectancy to the present complainants as trustees, "upon the trust that they take possession of all of said property, and convert it into money, and hold and invest the same upon security such as is required by a guardian under the laws of Ohio, being hereby vested with all the authority and powers necessary or appropriate for such purpose, and that they apply the net increase thereof, and so much of the principal as may be necessary, to the reasonable support of the family of William Means, including himself, the plaintiffs, and their said mother: provided that, upon agreement in writing of all the parties as to distribution of said trust funds, the trustees shall execute such agreement,"—with other incidental details and directions. And such a deed was executed by William Means, December 26, 1891.

The answer of the defendants sets up and claims that the sums advanced by Thomas W. Means to William Means, on and after February 15, 1888, were loans, and were not included in the scope of the will of Thomas W. Means, whereby advances of the kind therein described were to be forgiven; that, therefore, the administrators are entitled to set off the demand of the estate arising thereon against the legacy directed to be paid to William Means; and, further, that, if this were doubtful, the questions creating the controversy on this matter have been settled by and between the administrators and William Means, without notice of any assignment by him to the complainants, and that, upon such settlement, they have given up to the said William Means certain valuable securities; and, incidentally, they claim that the alleged agreement for an assignment to the wife and children, which formed the basis of the judicial proceeding in Greene county, did not, in fact, exist; and they also insist, on this appeal, that the suit is defective for want of proper parties defendant, it being urged that the other legatees under the will of Thomas W. Means should have been made parties to the suit.

Upon hearing the case on the pleadings and a voluminous body of proof, the presiding judge in the court below rendered an opinion, in which he suggested a difficulty in dealing with the case for the purpose of distribution, arising from the want of necessary parties to the suit; but, nevertheless, the court proceeded to discuss and decide the merits of the case, reaching the conclusion that the sums paid for the benefit of William Means were loans, not intended to be covered by the bequest in the will, and holding, further, that the question of the validity of the settlement by William Means with the administrators ought not to be decided in the present suit, but be postponed until the general settlement of the estate should be had, with all the necessary parties before the court. Thereupon, the following order was entered: "This cause came on to be heard at this term, and

was argued by counsel, and thereupon, on consideration thereof, the court finds the issue joined against the plaintiffs, and in favor of the defendants, and the bill is dismissed as against the defendant John Means at the cost of the plaintiffs. The plaintiffs are given leave, within thirty days, to amend their bill, so as to make it a bill for the general settlement of the estate of Thomas W. Means; but such amendment must be upon the basis of the conclusions of the court upon the issues already joined, as stated in the opinion herewith filed, and, in default of such amendment, the bill shall stand dismissed, as against all the defendants, at plaintiffs' costs."

The complainants having declined to amend their bill by bringing in other parties, a decree absolute was entered on the 31st of July, 1895, dismissing the bill, with costs, but without prejudice to the right of the complainants to recover in another suit the amount of said William Means' legacy, over and beyond the amount of the receipt of said William Means, for $136,035.75, and without prejudice to any issues not joined and found against them in this suit. It should further be stated that the court below held that John Means acted as the agent of his father in the transactions involved in the controversy, and was, therefore, not liable to account to the complainants. Accordingly, the bill was dismissed, as against him, unconditionally. The complainants appealed against both parts of the decree,— that in favor of John Means, as well as that in favor of the administrators; but they have since dismissed their appeal as against John Means, thus leaving only the question of the correctness of the decree of the court below in respect to the principal questions in the case touching the transactions in the furnishing of money by Thomas W. Means to William Means, and the settlement and receipt between the latter and the administrators.

John J. Glidden, John Little, H. P. Whittaker, and Little & Spencer, for appellants.

Lawrence Maxwell, Jr., Julius L. Anderson, and John F. Hager, for appellees.

Before LURTON, Circuit Judge, HAMMOND, J., and SEVERENS, District Judge.

SEVERENS, District Judge, having made the foregoing statement of facts in the case, delivered the opinion of the court.

The first question, in due order, which we are required to decide, is whether the suit is defective for the want of parties in respect to the object sought to be attained. The suggestion of the defendants is that the other legatees than William Means should have been made defendants. The object of the bill is to obtain a decree setting aside a receipt given to the administrators by William Means for the legacy given him by his father's will, and establishing the right of the complainants to recover the amount of such legacy. It cannot be doubted that the subject-matter of the suit is one of equitable cognizance, and that the bill was filed in the proper court. Payne v. Hook, 7 Wall. 425; Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906. The transactions in which the receipt was obtained were conducted in behalf of the estate by the administrators, and by them only. They alone represented the estate, and they are its sufficient representatives in a suit to set it aside.

In respect to the other branch of the relief sought, attention must be given to the essential nature of the controversy. It related substantially to the question whether certain funds which had been supplied by Thomas W. Means to William Means were in the nature of a debt to the estate, and so competent to be set off against his legacy. This is the theory of the counsel who represent the administrators, and we think it is entirely correct. Ad-

ministrators and executors are possessed of the legal title to the personal property of the estate. If there is a debt, they have a right to it in their representative capacity. In any controversy as to whether it is a debt or not, they are the proper litigants, and the only proper ones on that side of the controversy. They are trustees of the estate, and whether a certain claim is or is not parcel thereof is to be determined in a suit in which they stand for the estate. That there are legatees who are consequentially interested in the result does not make it necessary that they should be present in the suit, unless in a case where the trustees behave fraudulently towards them. The beneficiaries may sometimes be proper parties, but ordinarily, at least, they are not necessary parties. The controversy, as above stated, is the only one which exists, except that which relates to the receipt. No one questions the existence of the will, or the right of William Means to the legacy, and the only question is, as before stated, whether he owes a debt to the estate which must be set off against it. The question in this case is one relating to personal property only. The administrators have not the title to real estate. That passed directly to the devisees. The personal property they take from the hand of the administrators. We think that the administrators were the competent representatives of the estate, and the only necessary ones as the controversy now stands. It may be that the court cannot go so far as to order distribution, but it may go so far as to determine the right of complainants, and set aside the receipt, if that should be held proper. This would be no new thing. There are several cases in the supreme court and circuit court reports, where that has been the limit of the action of the court. Payne v. Hook, supra, is one of them, and is familiar. Nor is the bill premature for such purposes.

In the court below no question was raised as to the necessity of other parties until the hearing, when it seems to have occurred to the court that the suit might, on bringing in the other legatees, be treated as one for the settlement of the estate and proceed as such. In his opinion the learned judge held against the complainants on the principal question, "that the balance due by William Means to the estate of his father at his death was properly a debt, and not a gift." The court thereupon caused to be entered an order giving leave to the complainants to amend their bill, so as to make it a bill for the general settlement of the estate of Thomas' W. Means, but that such amendment must be upon the basis of the conclusions of the court upon the issues already joined, as stated in the opinion of the court, and that, in default of such amendment, the bill be dismissed. The complainants having declined to amend, the court directed the following decree, which was entered:

"The complainants having failed and declined to amend their bill herein, as permitted by the order entered May 25, 1895, or within the extended time allowed by subsequent orders of this court, it is now adjudged and decreed that their said bill be, and the same is hereby, dismissed, and the defendants shall recover their costs herein expended. But this dismissal is without prejudice to the right of complainants to recover in another suit the amount of one-fifth interest in the estate of Thomas W. Means, deceased, over and beyond the amount of the receipt

of William Means for $136,035.75, mentioned in said bill, and without prejudice to any issues not joined and found against them in this suit."

For the reasons already stated, we think there was no defect of parties for the principal objects of the bill. And, clearly, at that late stage of the case, no objection of the kind having been previously taken, the defendants were not entitled to have the complainants turned out, if they were entitled to some part of the relief sought, even if the suit were so constituted that all the purposes of a bill of wider scope could not be accomplished. McGahan v. Bank, 156 U. S. 218, 15 Sup. Ct. 347; Society of Shakers v. Watson, 15 C. C. A. 632, 68 Fed. 730.

The court below must have thought that the bill was sufficient for the purposes of deciding that the advances made to William Means constituted a debt to the estate, for it entered a decree which was expressly made final on that subject. The court declined to decide whether the receipt in question was valid or not, leaving that as one which might be tested on the final settlement. But the bill alleges the title of William Means to the legacy, and, in effect, the fraudulent procurement of the receipt from him without payment, and with knowledge of the complainants' rights under their assignment from the legatee. The pleadings were understood to involve the validity of the receipt while the parties were taking the testimony. We cannot doubt that this question was fairly open for decision, and we conclude that the proper parties were before the court for deciding as well the question of the existence of the claim as a debt as also the question whether the receipt was a valid recognition of it, and a release thereof.

Counsel for the administrators claim that, if William Means owed this debt, as one which survived the testator's death, it was and is proper matter of set-off against his legacy, and we think this claim well founded; and the proposition has, in this case, the support of an additional equity arising from the insolvency of the legatee. 2 Woerner, Adm'n, § 564; Wat. Set-Off, §§ 189, 190; Courtenay v. Williams, 3 Hare, 539; Hodgson v. Fox, 9 Ch. Div. 673; Blackler v. Boott, 114 Mass. 24; Brown's Adm'r v. Mattingly, 91 Ky. 275, 15 S. W. 353.

Upon the merits, the fundamental question is that which relates to the construction of the will of Thomas W. Means, the fourth and fifth paragraphs of which are set out in the preceding statements of facts. Much acute analysis and criticism has been bestowed by counsel on both sides upon its interpretation, and various canons of construction invoked. But we think the intention of the testator is so clearly indicated as scarcely to require the aid of more than the primary rule that, when the dominating purpose is clearly seen, the language of the will is to be construed, if possible, in such a way as to give it effect. This is called the "pole star" in discovering the intention. By the fourth paragraph, the testator devises and bequeaths all his personal property to his four living children, and the son of his deceased daughter, share and share alike. Then, by the fifth, after reciting that he had already made advances to the legatees, which had been charged

78 F.—35

upon his books, he goes on to say that he desires the equal division he made in the fourth paragraph "to be a provision for them, respectively, in addition to the advances" already made or which might thereafter be made, and that, in the division and distribution of his estate, the advances which he had made, whether before or after the making of his will, to any of his children, should "be treated, not as advancements, but as gifts, not in any manner to be accounted for by my said children or grandson, or any of them." The language could hardly have been made plainer to indicate that the leading purpose of the testator was that the property which he should leave at his death, irrespective of what he might have advanced to them during his life, should be divided among the five persons named. What they should have received from him, by way of loan, no longer was to be treated as such, but was to be forgiven. He uses the word "advances" in the sense of "furnishing," "supplying," in advance of the final distribution of his will. It is absurd to suppose that he used the word as equivalent to the technical word "advancements," for, in the face of the disposition to be made of his property at his death, he must have known that if, in the meantime, he should bestow property upon them, whether by way of gift or loan, it would not be an "advancement," as that word is used in legal phraseology. In the nature of things, it was not possible for him to have intended by "advances" the same thing as "advancements," for that involves an intention, at the time of supplying the money, that it shall be such. Besides, he uses that term indiscriminately to apply to what he had given and charged to his children before the making of the will, as to what he might thereafter charge them. The legacies of the equal provision were to be "in addition" to such advances, and how could the testator be supposed to have used the word "advances" in its technical sense, which involves a satisfaction or diminution of the legacy pro tanto, when he expressly declared that the legacies should be in addition to them? The testator intended that they should not be eaten away by what he should be moved to do for his children during his life. The will becomes operative upon the death of the testator. What this will then meant was this: Whatever the testator has helped his legatees to before this time, when distribution has finally come, though then a debt, is now forgiven. It "is not in any manner to be accounted for." The equal distribution now to be made of what remains is "in addition to said advances." For the lack of a more suitable word, we have frequently used this word in this opinion to express a similar meaning to that for which the testator employed it.

We are not prepared to say that under no circumstances could a debt from a legatee to the testator be created as an obligation independent of the absolution accorded by the will. Indeed, we think otherwise. But we think, also, that, having regard to the manifest purpose of the testator, when this will was made, to hold a free hand to help his children during his life as their necessities might require, and then at the end to divide what remained of his property equally among them, the court ought to require clear proof of some distinct purpose, on the part of the testator, during the

transactions when he furnished the helping means which is supposed to have created the debt, to put that debt outside of the pale of the forgiveness which he had written in his will. And it must have been his purpose, and not that of some other. Even an expectation on the part of the legatee that the moneys paid for his benefit would, in the end, come out of his share of the estate, would not change the situation, unless the testator himself had a corresponding intent. He was the master of his fortune, and if he did not lend his money with the intent that if not repaid in his lifetime it should be repaid to his executors, then it would fall under the provisions of this will. There is not to be found in this record any such clear proof of the purpose of the testator to establish by the furnishing of the financial help, which he did, to his son, an independent obligation on the son's part which, if not paid during his life, should not be condoned by the provision in his will. At the time when he sent John to Cincinnati to aid William in his distress, the substance of all he said, according to John's account, was to go and do for William what he thought best. John at that time held a power of attorney from his father, some time previously given, "to receive money, sign checks, notes, drafts, and bills of exchange; to indorse notes, checks, drafts, and bills of exchange payable to me or my order; to buy, sell, and transfer notes, bonds, stocks, bills of exchange, drafts, and checks,—hereby allowing, ratifying, and confirming whatever said John Means, attorney in fact, for me and in my name, may do by virtue of this authority." So far as appears, this, and the direction from his father to do what he thought best, was all the authority which John had when he went to Cincinnati and paid off William's liabilities to the bank, amounting to over $125,000,—a sum almost as large as the amount covered by the receipt in question. It does, indeed, appear that, by the father's acquiescence, upon the suggestion of John, who had the handling of his father's books, the account of these transactions was entered in a distinct place in these books, and they were kept separate from the former accounts with William. But there is not much, if anything, in all this, or in anything else disclosed by the testimony, to prove that Thomas W. Means had a purpose to banish William Means from his favor, or isolate him from the benefits of the plan of distribution of his property after death which had become the settled purpose of his life. It was immaterial to that purpose in what book or how the account was kept. Whenever and however kept, the charge would fall under the provision of exclusion by the will in the end, and the details of the bookkeeping he may well be deemed to have left to John, who had all such matters in charge. He had himself become blind, and incapable of supervising his books in person, and, as he confided in John, there was no reason for his going over them with the help of others, even if we assume that there was something on their face which disclosed this extraordinary purpose, which, indeed, we think is contrary to the fact. John's attention, when he testified in the case, was repeatedly drawn to his interview with his father about helping William, and the mode of keeping the books, but he continued to say that substantially all

his father said was to do as he (John) thought best in respect to both those matters. In reply to this question of his counsel, "State what, if anything, you said to your father with reference to taking a note from William Means for the amounts that he obtained after the failure of the bank in preference to a receipt," he said, "I gave as a reason to him that a receipt or charge on his books, simply, would not have the same effect, in law, that a note showing indebtedness to him would; that my understanding of his will, as he had made it, as he understood it, that it was better to take note than have an account or receipt,—to take a note showing evidence of indebtedness, and the collaterals received or redeemed from the bank on sale to be applied as credit on the note, keeping it as an indebtedness, in the shape to indicate and show an indebtedness." To the further question, "State what answer, if any, he made," he replied, "He told me to do as I thought was the best way to do,— to do as I thought best." As the father undoubtedly intended to keep it as an indebtedness, John's statement to him imported nothing more than the mere question as to the best mode of doing the business "in the shape to indicate and show an indebtedness," and there is nothing in the very full detail of testimony given by John to show that on any occasion the idea of establishing an indebtedness beyond the scope of the will was ever broached to his father, or that anything ever fell from him to show that such an idea had occurred to him. There was no suggestion by John to William, at the time when he came to his relief, that anybody expected that the money which was being supplied to him by his father was to be put beyond the operation of the will, or would stand on any special footing in that regard. On the other hand, we think the moral probabilities are all against the appellees' contention. Thomas W. Means was a man of strong character and fixed adherence to his plans in life. He was also a man of strong paternal affections, and had been accustomed to extend his assistance and support to all his children by employing his large means on every occasion of their need. It is incredible that he should have changed his attitude when William's calamities came upon him. The latter had gained considerable distinction in life, and no doubt he felt sensible of the credit to the family which his son's attainments reflected. He was the character of man who would be likely to have taken pride in them. He did not then know what, if any, moral delinquency there was in William's transactions. He knew that his son was in financial distress, and he came forward as was his wont, to help him out and re-establish him on solid ground. We are fully persuaded that we do him exact justice in refusing to believe that he then had a thought of inaugurating a new plan of dealing with William's expectancy. And if he did not then have such purpose, there is nothing in the evidence which would justify the belief that he at any time afterwards formed one.

There is much testimony going to prove the vigorous and persistent efforts of others interested in the estate to impress upon those transactions the character which their interests inclined them to think would be just. We greatly doubt whether John

Means had at any time any desire or intention to treat the advances made for William as excluding him from his share in his father's estate. It appears, and much stress is laid upon this by the appellees, that William gave his notes for the sum paid out for him, and towards the last appended to them a sort of pledge of or charge upon his expectancy. The giving of the notes would not, of itself, alter the character of the advances. There is no doubt that Thomas W. Means was accustomed to enter his charges in his books as denoting an indebtedness from his children to himself, or that he intended to continue that practice, and to hold them as debtors. The will signifies as much, when read in connection with his books, to which it refers; and, if his advances had meant gifts, the provision about them would have been superfluous, for a gift is neither an advancement nor a loan. If they were intended as loans for the time being, as no doubt they were, there was nothing out of the way in taking notes for them. But in the original and main transaction even this was not done. The subsequently taking a note was evidently an afterthought, and we think the probabilities are very strong that the taking of the note was not with any view to confirm, as against William, the idea that he was creating a debt to his father of any extraordinary character. There are many letters in evidence which passed between John and William during the time that these transactions were going forward. They are too many to transcribe here. We shall state the substance of them. On John's part they are full of manly tenderness and sympathy. He speaks in them of taking notes, but there is no intimation that they were to be taken for the purpose for which they are now sought to be used, and so of the pledges attached to some of the later notes. They signify, on the contrary, that the object was to put up a bulwark against the attacks of creditors, and to shield the collaterals which John had taken from William's creditors on paying them his debts, and probably, also, the legacy of William, for the father was old, and, as John's letters show, was not expected to survive for more than a short time. After John had returned home from Cincinnati on the occasion when he paid out $125,911.74, he wrote William, stating the sum he had paid, and said, "I think you had better send me a note at one day in father's favor for the amount," and that he had had a talk with a lawyer on his way up, who agreed with him that that was best, to close the matter up at present. This was the 16th of February. On the 20th of February, he wrote William again, saying:

"Herewith find forms which explain themselves. Please copy, sign, and return to me at your earliest convenience. * * * I also think it best for you to have as herewith indicated, fearing suits will be brought against you and other directors which may give you trouble as it now stands."

One of these forms was that of the note for $125,911.74. To this William, on the 21st, replied:

"Yours of the 20th received, and I send you by this mail my note to Thomas W. Means, or order, for $125,911.74; receipts for $700, $1,200, and $1,000, February 10th, 11th, and 18th, respectively; and authority to dispose of secu-

rities,—all as requested by you. I fully agree with your action in the premises as the best preparation for the civil suits which are likely to follow."

On the 23d John again wrote to William, saying:

"My Dear Will: Yours of the 21st inst., note and authority to sell securities, came to hand last evening. Am sorry that my reference to father's sight caused you trouble. He keeps cheerful and contented, walks out every day if good weather, some one taking his hand as he walks. Have explained to him my action in your affairs, amounts paid, how obtained, the advantage of saving securities pledged from being sacrificed, etc. He understands all, but soon forgets details, so that have to explain again when next I see him, and always ends by telling me to do as I think best for you."

In this correspondence, John's purpose in taking the note and authority to dispose of the collaterals is somewhat (though not very) obscurely stated, but it is not difficult to understand what he meant, or how William understood it. It is contended that this was a dishonest and illegal purpose, and that William should be precluded from setting up the invalidity of the notes. But the suggestion of taking them came from John. The correspondence between him and William, above referred to, shows that William was in great trouble and distress. He was agitated by the sense of his financial disaster, his becoming discredited as a man, and the fear of impending criminal prosecution. He confessed to John his unfitness for doing business, and he therefore turned over to him the charge and management of affairs. This correspondence, as well as the other evidence, all concur in showing that William yielded to John's suggestions, and followed them without question. John stood in the relation of a fiduciary toward his brother. In such circumstances it would be a strange perversion of the doctrine of estoppel to hold that William should be the party who is estopped. Such facts would indicate the propriety of holding the administrators to be estopped from setting up the products of John's unlawful proceedings, assuming they are such, as a bar to William's claim. The administrators do not represent any person who could have been defrauded, and it does not appear how these administrators of Thomas W. Means can assert any rights which belong to creditors, unless they are themselves such. We are convinced that the notes and instruments charging the legacy were intended to be operative only in case the creditors should proceed against the collaterals or for the purpose of subjecting William's legacy to the payment of their debts.

It is contended, on the part of the administrators, that it is not competent to controvert, by parol testimony, the plain terms of a written instrument, and this is undoubtedly a well-settled rule; but it does not apply to an instrument which has been given with the intention of both the parties thereto that it should become operative only upon some condition. 2 Whart. Ev. § 927; Burke v. Dulaney, 153 U. S. 228, 14 Sup. Ct. 816. In the case cited, the rule was stated and applied in an opinion delivered by Mr. Justice Harlan, in which he cited and discussed a large number of authorities illustrating the subject. Ware v. Allen, 128 U. S. 590, 9 Sup. Ct. 174; Pym v. Campbell, 6 El. & Bl. 370, 373; Davis v. Jones,

17 C. B. 625; Wallis v. Littell, 11 C. B. (N. S.) 369; Wilson v. Powers, 131 Mass. 539; Pawling v. U. S., 4 Cranch, 219. Besides this, when we consider the relations of the parties, it could not be permitted that the administrators should avail themselves of instruments, procured by John Means for the professed purpose of benefiting William, as a means, by converting it to another purpose, of cutting him off from his legacy. We cannot, therefore, hesitate in reaching the conclusion that there was no intention on the part of the testator, in making the advances to William on February 15, 1888, and subsequently, to create an obligation on William's part which would not be forgiven by his will. Whether John Means conceived such an idea, at a late stage in the transaction, we are not sure, and it is not necessary to decide. It is probable that William anticipated that some such fate might befall him. After his downfall, he seems to have been unsteady in his course, sometimes inclining strongly to his father's family, and seeming to be anxious to secure their affection and favor, and willing to do as they wished to that end. At other times he turned to consider the welfare of his own family, and his own obligations towards its members.

Having reached the conclusion that the debts incurred by William Means to his father were extinguished by the will, and that the administrators had no just foundation for claiming William's debts as a set-off against his legacy, it remains for us to consider whether what has been done between the administrators and William should be treated as a satisfaction of it. The defendants have exhibited extraordinary diligence in obtaining from William repeated renunciation of his claims. Some days before the testator's death, they obtained one such, and then, upon the day of their appointment, they solemnly indorsed upon the instrument their acceptance of the same as administrators, notwithstanding he had in the meantime revoked it; and on later occasions they obtained like concessions, culminating in the receipt and order of October 16, 1890, now in controversy. Such activity on the part of an administrator executing a will, in procuring the surrender of one who, by its terms, is a legatee, excites suspicion that they were conscious of standing on dubious ground, and ill comports with the duties of one standing in the place of a trustee for all the parties in interest. It is a violation of his duty when an executor becomes a partisan for one legatee and sacrifices the other. The law will not permit any unfairness on his part, or sanction a proceeding whereby the legatee is induced by his trustee to give up valuable rights without any, or a wholly inadequate, consideration. Here there was no consideration for the abandonment of his legacy by William Means to the administrators. It is contended by the appellees that the collaterals given up were valuable, and that William could not retain them and repudiate his receipt. Nearly all of them had been realized upon during the father's life, and the proceeds credited to William. A small part of them only were left. The collaterals which they surrendered to him had become his own property, when the debts which they secured had

been extinguished by the will. While the father was alive, he was a creditor of William in respect of the moneys loaned to him, and undoubtedly he had the right to enforce the collaterals, and thereby satisfy or reduce William's debt; but the situation was changed at his death. Then the will came into effect, and, the debt itself being discharged thereby, the purposes of the security ended by inevitable consequence. These collaterals had all the while remained in John's hands, and were obtained from him by one of the administrators, to turn over to William, whose receipt states that they were "received of E. C. Means (from John Means)." These collaterals the administrators claimed as property which they held in pledge for the debt which they asserted in favor of the estate against William. William had lost all his property, and was in very straitened circumstances. Since his downfall, he has been broken in spirit and wavering in his purposes. He seems at times to have been impressed that the administrators had a moral, if not a legal, claim upon him that he should yield up his legacy to the estate, and this claim was pressed and insisted upon by the administrators. That they had no such legal claim upon him we have already determined. His brother and sisters all being in affluent circumstances, and his own family in needy circumstances, that he should have voluntarily given up the whole of this large sum, with no mistake in regard to what his legal rights were, it is difficult to believe. It amounted simply to a gift to the administrators for the benefit of the other legatees, whose only claim rested on the bounty of the testator. Courts of equity view such transactions with distrust, and, if the circumstances indicate that the trustee has dealt with the beneficiary unjustly, will not hesitate to set them aside. The absence of any adequate consideration in itself raises a presumption of unfairness, which the trustee is bound to repel. Equity will relieve the legatee in such transactions, where he has, under a misapprehension of his legal rights, surrendered to the trustee valuable interests without any adequate consideration, especially where the situation is such that no harm will come to the interests of others. Such would be the case where the claim relates to a fund which has not yet passed beyond control. These propositions are amply sustained by authority. 1 Story, Eq. Jur. §§ 307, 308; 2 Pom. Eq. Jur. §§ 948, 951, 955, 956, 958, 1088; Taylor v. Taylor, 8 How. 183; Comstock v. Herron, 6 U. S. App. 629, 5 C. C. A. 266, and 55 Fed. 803, and the cases there cited; Mills v. Drewitt, 20 Beav. 632; In re Ashwell's Will, Johns. Eng. Ch. 122; Snow v. Booth, 2 Kay & J. 132; Oil Co. v. Hawkins, 20 C. C. A. 468, 74 Fed. 395. "It is not," says Mr. Justice Story, *ubi supra*, "upon the feelings which a delicate and honorable man must experience, nor upon any notion of discretion, to permit a voluntary gift or other act of a man, whereby he strips himself of his property, that courts of equity have deemed themselves at liberty to interpose in cases of this sort." They "will not, therefore, arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relations between the parties which compel the one to

make a full discovery to the other or to abstain from all selfish projects. But when such a relation does exist, courts of equity, acting upon this superinduced ground, in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance, for it is founded in a breach of confidence." It makes no difference that the other legatees would ultimately obtain the benefit of the wrong. However innocent of it they may be, it would come tainted to their hands. Even gifts between persons who stand in no confidential relation to each other are watched with jealousy. 2 White & T. Lead. Cas. Eq. 582; Cooke v. Lamotte, 15 Beav. 234. Where the transfer is of a large sum, and constitutes the whole of the property of the party making it, himself having obligations to those in need, to one standing in no need, it raises an almost insurmountable presumption that there has either been some untoward influence or gross misconception on the part of the party making it of his rights and obligations. It is possible that the administrators were actuated by a purpose to get William's share out of the way of creditors, thinking the other legatees were more justly entitled to it; but they do not charge themselves with any such purpose, and we shall not impute it to them. We are, therefore, of the opinion that the transactions which took place between the administrators and William Means, among them that of taking the receipt of October 16, 1890, ought not to be allowed to bar the enforcement of the payment of the legacy.

In view of the conclusions which we have reached in respect to the title of William Means to the legacy in question, it is not necessary for us to decide whether, as against the administrators, there is any sufficient proof of the existence of the agreement between William Means and the members of his family which is said to have been made in February, 1890. The trust deed executed by him on December 26, 1891, conveyed his interest to the present complainants as trustees. As between William Means and the complainants in the Greene county court of common pleas, there having been due service of the process upon him, the decree therein rendered, and the trust deed, were effective in transferring the title, and estop him from denying that it was in fact transferred. It is no concern of the administrators whether they are required to pay the legacy to the legatee, or to his assignee; nor can they require that the rights of William Means' creditors should be litigated in this suit. They are not parties, and that subject could only be considered in independent litigation. Akin to that matter is the question presented in regard to the complainants' trust being in part for the benefit of the grantor in the deed. Whether, as to creditors, that part of the trust would be obnoxious to their attack, we do not, for the reasons above stated, think it is necessary or proper to decide.

The result is that the decree of the court below must be reversed, and the cause remanded, with directions to enter a decree for the complainants setting aside the receipt of October 16, 1890, and directing an account to be taken for the purpose of ascertain-

ing the amount due in respect of the legacy of William Means, and that thereupon the complainants are entitled to recover the same. The complainants will recover costs in this court and in the court below, to be paid by the administrators from the funds of the estate.