EDDY v. EDDY et al.

(Circuit Court of Appeals, Sixth Circuit. March 25, 1909.)

No. 1,867.

1. WILLS (§ 797*)—PROVISION FOR WIDOW—ELECTION—FRAUD—RESCISSION.
    Where the widow of a man whose estate amounted to more than $400,-000, 78 years old, in feeble health, unused to business, and in need, was approached by her husband's son, who was named as his executor, and who was a devisee, legatee, and an intelligent and competent business man, knowing all the facts concerning the estate, and was induced by him to make an election of an annuity, the present worth of which was not more than $3,500, without giving her any information concerning her right under the statutes of the state to elect to take a widow's portion, which would have been of much greater benefit to her, and to renounce the will, the widow would be relieved in equity from the consequences of such election, especially where her application was made before the estate had been closed, so that no harm would result to the interest of other beneficiaries.
    · [Ed. Note.—For other cases, see Wills, Cent. Dig. § 2069; Dec. Dig. § 797.*]

2. COURTS (§ 489*)—FEDERAL COURTS—JURISDICTION—PROBATE PROCEEDINGS.
    While federal courts will not take cognizance of purely administrative proceedings in the settlement of deceased's estates, and will not invade the possession of the assets taken by probate courts for the purpose of administration, federal courts will take jurisdiction of a suit by a widow, a citizen of one state, against the executors of her deceased husband's estate situated in another state, to set aside her election to take under the will, as procured by fraudulent concealment by one of the executors, and to establish and enforce her claim under the statute of descents and distribution of the state, allowing a widow to elect to take a statutory estate instead of the provision made for her by the will.
    [Ed. Note.—For other cases, see Courts, Dec. Dig. § 489.*
    Probate jurisdiction, see note to Bedford Quarries Co. v. Thomlinson, 36 C. C. A. 276.]

3. COURTS (§ 200¼*)—PROBATE COURTS—EQUITABLE JURISDICTION.
    A probate court has no plenary equitable jurisdiction to grant a widow relief from an election to take under her husband's will, procured from her by one of the executors by alleged fraudulent concealment.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 476, 477; Dec. Dig. § 200¼.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. LIMITATION OF ACTIONS (§ 100*)—COMPUTATION OF PERIOD—DISCOVERY OF FRAUD.

After the filing of a husband's will for probate, one of the executors went to another state, where the widow was residing, and by fraudulent concealment procured from her an instrument which she did not know was an election to take an annuity under the will and releasing her statutory estate, and in fact did not know that she had a right to make such an election. She had no knowledge at the time as to the value of the estate nor that she had been imposed upon, until May 25, 1907, more than five years after making such election, when within two months thereafter she filed a bill to vacate her election and to receive her statutory estate. *Held*, that the year within which the widow was required to elect as provided by Comp. Laws Mich. § 9301, did not begin to run until she discovered the fraud, and hence she was not barred thereby from obtaining such relief.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 480–493; Dec. Dig. § 100.*]

5. COURTS (§ 489*)—FEDERAL COURTS—ACCOUNTING.

Where a federal court had jurisdiction of a suit by a widow to set aside an election to take under her husband's will and to be awarded her statutory estate, the widow being entitled to such relief, the court would not only determine her right, but would take an account, the estate being still unsettled, and determine the amount the widow was entitled to receive therefrom.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 489.*]

6. WILLS (§ 797*)—WIDOW'S ELECTION—VACATION—EVIDENCE.

In a widow's suit to set aside an election to take under her husband's will, awarding her only a small annuity, procured by one of the executors by fraudulent concealment, the books of a business concern in which the widow was interested were admissible as bearing on the disparity between the value of the widow's statutory interest and what she received.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 797.*]

7. EQUITY (§ 404*)—TESTIMONY BEFORE MASTER—OBJECTIONS.

Where testimony in an equity suit is taken before a master, counsel has no right to direct a witness not to answer questions believed to be objectionable, the proper course being to state the objection on the record, after which the answers must be received and the objections retained to the hearing.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 888; Dec. Dig. § 404.*]

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

Alfred Lucking, for appellant.
W. S. Humphrey, for appellees.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

SEVERENS, Circuit Judge. This is an appeal taken by the complainant from the decree of the Circuit Court dismissing her bill, wherein she sought the rescission of an instrument in which she had signified her acceptance of the provisions made in her behalf by the last will and testament of her deceased husband, Charles K. Eddy, and released all other claims against his estate. She alleged that the instrument was obtained from her by undue influence and fraudulent concealment practiced by Walter S. Eddy, who was one of the execu-

tors of the said will, and the following were some of her prayers for relief:

"(3) That this court will by its decree hold that the failure of complainant to file in the probate court for Saginaw county the statutory notice of her election to take her widow's portion of her husband's estate in lieu of the provisions for her made in the will of her husband was due to the fraud, fault, and artifice of said defendants, and not to any fault or neglect of complainant.

"(4) That this court will by its decree find that complainant was fraudulently prevented by defendants from securing her just rights in her husband's estate and from taking the provisions allowed to her by the statutes of Michigan, and that this court will establish complainant's present right to elect to take, in lieu of the provisions of said will, the share of her husband's present estate secured by statute as aforesaid to her as his widow, and will give her the same allowance as if she has duly elected to take under the statutes of Michigan, and will in all respects undo the effects of said fraud and restore your oratrix to her rights.

"(5) That this court will order an accounting of the assets of the estate of said Charles K. Eddy, deceased, and of the dealings between defendants, individually, and as executors, as to the affairs of said estate, including all receipts and disbursements, and will cause said defendants to pay and turn over to this complainant her just share of the present assets of the estate of her husband, just as if she were now electing lawfully and formally to take under the provisions made for her by the laws of Michigan, in lieu of the annuity left her under the terms of the will of her deceased husband."

By section 9300, Comp. Laws Mich., it is provided:

"That all dispositions of personal property by last will and testament shall be subject to the following limitations and restriction:

"First, if the testator shall leave surviving him, a wife, the testamentary disposition shall be subject to the election of such wife, to take any interest that may be given to her, by the testator in his last will and testament; or in lieu thereof, to take the sum or share that would have passed to her, under the statute of distributions, had the testator died intestate, until the sum shall amount to five thousand dollars, and of the residue of the estate one-half the sum or share that would have passed to her, under the statute of distributions, had the testator died intestate, and in case no provision be made for her in said will, she shall be entitled to the election aforesaid. * * *"

And by section 9301 that:

"The election to take otherwise than under the will, in any contingency above contemplated, shall be made in writing, and filed in the court in which proceedings for the settlement of the estate are being taken, within one year from the probate of the will; and the failure to file such election within the time above provided shall be deemed an election to take under the will."

The defendants are the executors of the will and the heirs, legatees, and distributees of the estate.

The facts which constitute the subject of the controversy as alleged in the bill are substantially these, although others may be mentioned incidentally in dealing with particular topics: Charles K. Eddy, already somewhat advanced in years, was a man of considerable wealth, residing at Saginaw, Mich., where he had a home and a place of business. He, with his three children, the defendants in this suit, owned, each one-fourth, the capital stock of C. K. Eddy & Sons, a corporation engaged principally in dealing in lands and timber. He had a home at Los Angeles, Cal., where he spent portions of the year. He had also other property. And in the whole his estate was of the value of nearly $500,000. He had already made, in anticipation of his marriage, a.

division of his property between his three children by a former marriage and himself in such manner that each would own a one-fourth interest. In the summer of 1897 he met the complainant, with whom he had been in close friendly relations in their youth while living at their homes in Maine, and to whom he was at one time engaged to be married. She, too, had been married, but the wife of the one and the husband of the other had been dead for several years. Their friendship was renewed, and on November 3, 1897, they were married. He was then about 76 years old, and she was about two years younger. They lived together happily, most of the time at Los Angeles, until his death, which occurred May 9, 1901. His children were not pleased with the marriage, but the sons treated her with respect and kindly. Their relations with her were, however, not intimate. There is some evidence in the record indicating that the father felt hurt at the lack of cordiality shown by his children to his wife. He left a will made December 9, 1896, and a codicil thereto dated July 30, 1898. By these he devised his homestead at Saginaw to his son Walter, and then devised and bequeathed all his other real and personal property to his children in specified proportions; but he charged upon the estate an annuity of $500 to be paid to Cordelia Dunning Dolliver of Saginaw during her life, and another "annuity of $500, per year during her natural life," to his wife, Caroline M. Eddy. He appointed his sons as executors. At the time of Mr. Eddy's death, the lady named Dolliver in the will was living or staying with the Eddys at Los Angeles. The expenses of his last illness and his funeral consumed the funds on hand, and Mrs. Eddy was in some embarrassment about her means of sustenance. Nothing was heard from Mr. Eddy's children in Michigan until finally some friends of Mrs. Eddy communicated by letter with them, apprising them of her need and inquiring whether any and what provision had been made for her by her late husband. No response was made to these inquiries except to say that they were engrossed with anxiety over the illness of the daughter, Mrs. Mills, but that as soon as was practicable they would give attention to the matters inquired about and would then give information about them. Meantime they sent to Mrs. Dolliver the sum of about $2,500 to pay funeral expenses and for her use and that of Mrs. Eddy. How much came to Mrs. Eddy does not appear. She continued to be in need. Mrs. Dolliver seems to have regarded Mrs. Eddy with much disfavor, and as a burden which she was evidently anxious to be rid of. Mrs. Dolliver was a sister of Mr. Eddy's first wife. A letter found in the record, written by Charles K. Eddy not long before his death to his son Arthur, shows that his children were already endeavoring to obtain assignments of his property, and that he protested vigorously against what he called their "wholesale scramble for the assignment of all my interests (supposed or otherwise) outside of the corporation," which, he says, "is uncalled for, and not conducive to happiness for any of us." But the danger was that, being in feeble health, he might be moved to make some other disposition more favorable to his widow than he had made by his will. This letter, of which we have quoted only a small portion, shows his extreme solicitude for

peace in the family, and explains the motive he had in making so meager a provision for his wife.

On August 26, 1901, Walter S. Eddy filed his petition for the probate of his father's will (and codicil) in the probate office at Saginaw, and a day was set for hearing. In this petition he stated the value of the estate to be $50,000. On the same day he started for Los Angeles, taking a copy of the will and of his petition for the probate thereof with him, and a deed of the Saginaw homestead, running to himself, ready to be executed by his father's widow. One of the letters of inquiry written to the relatives in Michigan was sent by a Mr. Weller, an attorney at Los Angeles, who had been spoken to by a friend of Mrs. Eddy about the way of getting help for her from her husband's estate. Remembering this, Mr. Walter Eddy, on his arrival at Los Angeles, went first to the office of Mr. Weller, and stated his object to be to adjust with Mrs. Eddy her claims upon the estate of his father, and asked him to go with him and be present at his interview with her. Mr. Weller declined to do this unless he should be requested to do so by Mrs. Eddy. It should be stated that Mr. Weller had not been retained generally to assist her in the settlement of her claims against the estate. At the instance of a friend of hers, made in her presence, he had written to find out what was intended to be done by the family for her, and had informed himself of the law of Michigan in regard to the rights of widows in the estates of deceased testators. But it does not appear that he had ever informed her what that law was. It does appear, however, that he did not regard himself as employed to advise her in regard to the settlement of her claims, and this was sufficiently evident to Mr. Eddy from Mr. Weller's refusal to attend at the proposed conference. After the conference was over, Mr. Eddy saw him again and proposed to settle with him for his services to Mrs. Eddy. He had been told by Mrs. Eddy that Mr. Weller had not been employed by her, but he paid him $10. On first leaving Mr. Weller, Mr. Eddy went to see Mrs. Eddy, and he testifies that he told her the object of his visit to be to find out what her wishes were in regard to her claims upon the estate; that he told her she had a right to elect whether to take under the will or to take under the statute of Michigan; that he told her what the provision in the will was; that he proposed to pay her $300 for the furniture in the house at Los Angeles, which she agreed to accept; that he advised her to have her counsel present, but that she said she was capable of taking care of her affairs and did not want a lawyer; that he read the will to her, and that she stated her desire to be to take what her husband left for her. His testimony about this interview gives a different account about these details from that of Mrs. Eddy. Mrs. Dolliver was present, but was not called as a witness. But the important facts are that if, as he says, he told her there was a statute in Michigan under which she might elect, which we doubt, he did not tell her what its provisions were, what share of the estate she would get under it, or how long a time she had in which to inform herself and make her choice. Nor did he tell her the value of the estate. He gave her the impression that it was of a value which would make her share under the statute about of the value of her an-

nuity under the will. He had present a copy of the will, which he says he read to her. Attached to that was a copy of the petition for its probate, and in that it was stated that the value of the estate was $50,000. It is fair to presume that he did not omit to point out that statement. He had it for some purpose. When testifying upon this subject, the following colloquy took place:

"Q. Now, did you tell her the size of your father's estate, what he left? A. I told her anything that she asked me. Q. Did she ask you how much he had left? A. I don't know that she asked me that question in so many words. Q. Did you tell her what it was? A. I told her anything that she asked me. Q. Did she ask you that? A. I couldn't say whether she did or didn't. Q. Did you tell her the contents of the petition you had signed the day you left here? A. I told her the facts of anything— Q. Did you tell her that the petition showed that his personal property was worth $50,000? A. I did, if she asked me. Q. Well, did she ask you to tell her how much the estate was? A. I couldn't say. Q. To the best of your knowledge and recollection, state whether or not, if you did tell her, you told her it was $50,000? A. I told her exactly the facts, what I told her. Q. No, no; did you tell her what that petition showed? Did you mention the petition to her? A. I couldn't say; I don't remember. Q. No recollection of doing so. Have you any recollection of doing so—telling her what the petition showed? A. Recollection of doing what? Q. Telling the size of her father's estate—of her husband's? A. I stated, if she asked me any questions, I answered them. Q. But you remember some things she asked you about; do you remember her asking you that question? A. No, sir; I have no recollection. Q. If you had told her anything about it, you would have told her, wouldn't you, this petition—as to the amount stated in any petition subscribed by you and filed the day you left? A. I probably would have told her exactly what the facts were. Q. Well, would you have said $50,000? A. If that is the amount spoken of, I should, naturally."

Mrs. Eddy testified that she knew her husband was, or was reputed to be, a man of large means, large enough to enable him to live without work, but she did not know how large; that she was ill and depressed in spirits when Walter Eddy came to her after her husband's death; that she did not read the instrument, nor ask to have it read; that she supposed Walter was doing what was right; that she had no knowledge of the statute giving her an election, and supposed that all one could have was what was given her by the will. She is described in the testimony as being at that time 78 years of age, in feeble health, of little experience in business affairs, and as gentle and trustful in disposition. Mr. Eddy obtained from her a quitclaim deed of the homestead at Saginaw, and the following election and renunciation of all claim in her husband's estate:

"Los Angeles, Cal., September 4, 1901.
"For and in consideration of the payment to me of the sum of $300.00 by W. S. Eddy, receipt of which is hereby acknowledged, I, Caroline E. Eddy, hereby transfer and assign and relinquish to W. S. Eddy, all the right, title or interest I may have or might have in the household furniture or personal property in the former residence of my late husband, Charles K. Eddy, at the southeast corner of Twelfth street and Westlake avenue, in Los Angeles, California, and also all my right, title and interest in and to the household furniture or personal property heretofore belonging to my husband, the late Charles K. Eddy, excepting from said personal property such as I may have selected. The personal property which I have selected to be removed by me at once. It is understood that I have already made the selection of personal property which I may take and that the same has been removed from said residence. This receipt and assignment is intended to be a full and complete assignment

of all my interest in any personal property belonging to my late husband, Charles K. Eddy, and of any interest in his estate, other than the interest which I have by reason of a right to an annuity of $500.00 per annum. And I hereby also acknowledge receipt of the sum of $250.00 as the first semi-annual payment of my annuity as provided for me in the will and codicil of my late husband, Charles K. Eddy. Said will being of date December 9, 1896; and being filed for probate in the county of Saginaw, state of Michigan, on the 26th day of August, 1901. In consideration of the foregoing payment, I declare that I recognize the validity of said will, consent to the probate thereof, and agree to accept the terms and conditions of said will as entirely binding upon me.

"In witness whereof, I have hereunto executed this assignment, agreement and receipt, the day and year first above written.        Caroline E. Eddy."

And in return she secured an annuity of $500 during her life. When asked what she intended to do with herself, she told him she was going to live with her son in Oregon. He hired a man to take her there. The place was a small farm near a hamlet of about 200 people, and the house is described by the witnesses as "a little old shack, * * * a couple of rooms, that was boarded up and down." The annuity of $500 was seasonably paid by the executors. She lived there a number of years without any knowledge of the value of what she had forfeited, until, in 1907, she happened to be called to testify in a divorce case between her husband's daughter and the husband of the daughter, when she was informed of the value of her husband's estate by a lawyer who was conducting the case for one of the parties. The present suit was commenced soon after. The settlement of the estate in the probate court has not been closed, and meantime the executors have been carrying on the business of the company with the assets of the company as before the testator's death.

These, then, are the salient facts. A widow of a man whose estate is worth from $400,000 to $500,000, 78 years old, in feeble health, unused to business affairs, in need of the means of support, and still in the shadow of her husband's death, is approached by the executor of his will, who is also a devisee and legatee and an intelligent and competent business man, and knowing all about the amount and condition of the estate, and of the right of election given by the law to the widow, and is induced by him to forthwith make her choice to accept an annuity whose present worth, having regard to her age, was not more than $3,500, and renounced her right to claim under the statute a sum nearly twenty times as large, and this without any information from the executor or any one else in regard to the amount of the estate or the proportion she would take under the statute. We think it would be safe to add that the executor designedly refrained from giving her any information on these subjects, and regarded it as his privilege to refrain from giving her any information which she did not ask; and he accomplished in a way profitable to himself and his brother and sister the object of his errand. And he left her the pittance of an annuity that would scarcely amount to more than a widow would be allowed out of such an estate by way of special and preliminary allowances and provisions pending a speedy settlement of it. He dealt with her courteously as far as good manners went. That was a good means to his end. But it was an extremely hard bargain.

We do not know on what grounds the court below dismissed the bill, but we gather from what was said at the hearing that it must have been upon the ground that the complainant had not within the year signified her election to take under the statute, and that the statute made this neglect a peremptory bar. It seems to us a case in which upon its merits the complainant is clearly entitled to relief by a court of equity. Whether she is precluded by the statute referred to we shall consider later on, in dealing with the several grounds taken in defense. If she had been let alone, and nothing had been done to induce her to a premature conclusion, or to conceal from her the facts which would be material for her choice, it might be that her neglect to dissent from the will within the year would operate to bar her claim. But this is not that simple case. She had known nothing of the provisions of the will and nothing of the provisions of the statute, or, indeed, that there was such a statute until Mr. Eddy came and the transaction was all done in a day. The statute gave her a year after the probate of the will in which to make her election. This was to give her time to learn the facts on which it would be exercised, for deliberation thereon, and to get removed from the influences of those sentiments which might unduly influence her. The executor stood, as to her, in the relation of a trustee. It did not matter that his appointment had not yet been confirmed. It was expected that it shortly would be, and he was then acting in that character and in behalf of the estate. Moreover, all the defendants obtained, and seek to preserve, the fruit of his negotiations and bargaining with the complainant.

The rule of equity applicable to such cases has long been settled, and there has been no variation in it within the bounds of which this case might fall. In Cowen v. Adams, 78 Fed. 536, 24 C. C. A. 198, which was a case where a legatee was seeking relief from an instrument obtained from him by an executor whereby he had released his claim to his share in the estate in circumstances which made it unjust and inequitable that it should be enforced, we said, at page 552 of 78 Fed., and page 214 of 24 C. C. A.:

"Equity will relieve the legatee in such transactions, where he has, under a misapprehension of his legal rights, surrendered to the trustee valuable interests without any adequate consideration, especially where the situation is such that no harm will come to the interests of others. Such would be the case where the claim relates to a fund which has not yet passed beyond control. These propositions are amply sustained by authority. 1 Story, Eq. Jur. §§ 307, 308; 2 Pom. Eq. Jur. §§ 948, 951, 955, 956, 958, 1088; Taylor v. Taylor, 8 How. 183, 12 L. Ed. 1040; Comstock v. Herron, 6 U. S. App. 629, 5 C. C. A. 266, 55 Fed. 803, and the cases there cited; Mills v. Drewitt, 20 Beav. 632; In re Ashwell's Will, Johns. Eng. Ch. 122; Snow v. Booth, 2 Kay & J. 132; Oil Co. v. Hawkins, 20 C. C. A. 468, 74 Fed. 395, 33 L. R. A. 739."

And the relief prayed for was granted. This judgment was affirmed by the Supreme Court in Adams v. Cowen, 177 U. S. 471, 20 Sup. Ct. 668, 44 L. Ed. 851. This doctrine has been enforced in many other decisions, a number of which are collected in the briefs of counsel, and is laid down by writers of text-books of the highest authority. Other authorities than those cited in this foregoing passage are: Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260; Griffith v.

Godey, 113 U. S. 95, 5 Sup. Ct. 383, 28 L. Ed. 934; Comstock v. Herron, 55 Fed. 803, 5 C. C. A. 266, 6 U. S. App. 626; Story's Equity Jur. §§ 307, 308; 2 Pomeroy's Eq. §§ 951, 958, 1088; Bispham's Prin. of Eq. §§ 231, 232, et seq. And it has been the law in England from a remote period. Huguenin v. Baseley, 14 Ves. 273. Gibbs v. Guild, L. Rep. 8 Q. B. D. 296, and 9 Q. B. D. 39, on appeal, where the history of the doctrine is stated in the elaborate opinions of the Lord Chief Justice Coleridge and of Lord Justice Brett. Lord Justice Holker dissented in that case, for the reason that the action had been brought as an action at law.

We will next attend to the objections raised by counsel for the defendants.

1. It is urged that a Circuit Court of the United States has no jurisdiction to entertain a suit of this character. This position is stated in the brief in the following expressions:

"The courts of the United States have no probate jurisdiction, and must receive the sentence of the court to which the jurisdiction over testamentary matters is committed as conclusive of the validity and contents of a will; and an original bill cannot be sustained upon allegations that a probate of a will is contrary to law. If any error is committed in allowing the probate, the remedy is in the state courts according to their appropriate modes of procedure, and, if a federal question is raised in such proceeding, an appeal will lie from the state courts to the federal courts. See Fouvergne v. City of New Orleans, 18 How. 473, 15 L. Ed. 399; Williams v. Benedict, 8 How. 107, 112, 12 L. Ed. 1007; Broderick's Will, 21 Wall. 503, 22 L. Ed. 599.

"It is a rule of general application that, where property is in the actual possession of one court of competent jurisdiction, such possession cannot be disturbed by any other court. This doctrine has been affirmed again and again by the Supreme Court of the United States. Hagan v. Lucas, 10 Pet. 400, 9 L. Ed. 470; Taylor v. Carryl, 20 How. 583, 15 L. Ed. 1028; Peck v. Jenness, 7 How. 612, 12 L. Ed. 841; Ellis v. Davis, 109 U. S. 485, 498, 3 Sup. Ct. 327, 27 L. Ed. 1006; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, 28 L. Ed. 145; Covell v. Heyman, 111 U. S. 176, 4 Sup. Ct. 355, 28 L. Ed. 390; Borer v. Chapman, 119 U. S. 587, 600, 7 Sup. Ct. 342, 30 L. Ed. 532."

It is undoubtedly true that, when the matter in controversy is one within the exclusive jurisdiction of the probate court, the courts of the United States will not assume jurisdiction. They will not take cognizance of the purely administrative proceedings in the settlement of estates of deceased persons. Nor will they invade the possession of the assets taken by those courts for the purposes of administration. But when a citizen of one state has a claim upon the estate of a deceased person situated in another state, or a matter of controversy with a citizen of such other state who represents, or has an interest in, the estate, and whether such claim be of a legal or equitable nature, he has a right under the Constitution and laws of the United States to come into its courts for a remedy, and of this right he cannot be deprived by any law of the state. Such a right is the matter in controversy in the case before us. It is not necessary to its determination that the court should take the possession of any property out of the hands of the probate court. The complainant seeks the rescission of an instrument which she says these defendants have unjustly and by inequitable means obtained from her and the use of which will harm her in the probate court. That court has not plenary equitable jurisdiction whereby it could give her relief; and, if it had, that would

not exclude the jurisdiction of the federal court. It would simply establish it as a court of co-ordinate authority with the federal court, and the complainant, being a citizen of another state, would still have the right to go into the federal court for relief. The right and power to determine the controversy between the parties rested in the Circuit Court of the United States, and it could proceed to that extremity without exciting any conflict with the probate court. When that is done, the claim is presented to the probate court as one adjudicated, and upon the footing of the adjudication the court will respect it in ordering the disposition of the assets of the estate. Thus the rights of all the parties are in due form of law, and, without the invasion of the province of any court, enforced. This outline of the respective provinces of the federal courts and the probate courts of the states is deduced from a number of decisions of the Supreme Court, among which we may refer to: Payne v. Hook, 7 Wall. 425, 19 L. Ed. 260; Yonley v. Lavender, 21 Wall. 276, 22 L. Ed. 536; Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906, 37 L. Ed. 867; Farrell v. O'Brien, 199 U. S. 89, 25 Sup. Ct. 727, 50 L. Ed. 101. This contention of the appellees must therefore be overruled.

2. It is further contended that the instrument in question did not prevent the complainant from electing to take under the statute, and that she has lost her right by neglecting to signify her dissent from the will within the year after it was admitted to probate. Counsel say:

"This woman had a perfect right to file her written election with the probate court of Saginaw county at any time within one year, and this instrument signed by her had no effect whatever upon that right, as the statute required no election if she took under the will, and this paper did not affect her right to take under the statute if made within the year."

We do not admit, however, that the effect of the agreement was restricted in the manner stated. This brings us to the ground on which, as we have said, we suppose the court below dismissed the bill.

The theory of the bill is that the complainant supposed she was concluded from any further claim upon the estate by her transaction with the executor, and neglected to take any further action in regard to the will upon that understanding, and we think that she might reasonably guide her course upon the assumption that all her claims upon the estate of every sort, except the annuity, were gone. Nor have we any doubt that the executor understood that the instrument excluded her from all participation in the distribution of the estate except the reception of the annuity. She could not take both courses—that is, take the annuity and under the statute also; and he induced her to take that annuity, and continued to send it, until the wrong he put upon her was discovered.

But is the proposition sound that, whatever the conditions, whether brought about in the due course of things, or by the wrongful devices of the party profiting by their success, the right to election is gone with the lapsing of the year, and no court has the power to relieve the injured party from the consequences? To say this is to give to the other party the fruits of their own misconduct, a result which must be always abhorrent to a court of equity. In 19 Am. & Eng. Encl. of Law (2d Ed.) 243, it is said:

"It has always been the rule in equity that the defendant's fraudulent concealment of a cause of action will postpone the running of the statute until such time as the plaintiff discovers the fraud; the defendant, having by his own wrongdoing prevented the plaintiff from instituting his suit, will not be permitted to take advantage of his own wrong by setting up the statute as a defense."

And, as we shall see, in several of the cases cited, the rule has been applied not only to statutes of limitation prescribing the time within which actions shall be brought, but to other cases where the neglect of the party would have precluded him from a valuable right. Bailey v. Glover, 21 Wall. 342, 22 L. Ed. 636.

Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686, 29 L. Ed. 839, was a case where the plaintiff had neglected to redeem within the year prescribed by the statute; and she was relieved from the consequences. Several of the justices dissented, but that was upon the view which they took of the facts. They said:

"In our opinion there is no evidence of such misconduct on his part as afforded any ground, in law or equity, to justify appellee in her failure to redeem from the sale."

This was said by the same justice (Miller) who delivered the opinion in Bailey v. Glover.

Schroeder v. Young, 161 U. S. 334, 16 Sup. Ct. 512, 40 L. Ed. 721. This also was a case of failure to exercise the right of redemption within the time prescribed by law. And in Allen v. Conklin, 112 Mich. 74, 70 N. W. 339, where a bill was filed by a ward against the executors and heirs of a deceased guardian to establish a lien upon the decedent's lands in the hands of his heirs for the satisfaction of the liability of the guardian for moneys belonging to the ward which he had converted to his own use. There was a statute of Michigan which required all claims against deceased persons to be presented to commissioners appointed by the probate court for the hearing of claims within a certain time prescribed by the statute. The complainant had not done this. The estate was long since closed, and the statute would cut her off. But she alleged that the facts had been concealed from her, and that she had only recently discovered them. The court held that the defendants could not set up the statute to bar her claim, and granted her the relief she prayed. This case shows very clearly that in Michigan the statutory limitations in regard to claims against estates, while they are applied constantly in ordinary cases, do not exclude the jurisdiction of a court of equity to prevent a defendant from using the statute to protect himself in the enjoyment of the fruits of wrongdoing. In Rankin v. Big Rapids, 133 Fed. 671, 66 C. C. A. 568, we reviewed the decisions of the Supreme Court of Michigan upon this subject, and, as we hoped, made it clear that while that court had inflexibly enforced these statutes of limitation under ordinary conditions, yet had recognized the right of a court of equity to prevent defendants from setting up such statutes to accomplish an inequitable purpose.

The case is free from any difficulties in granting proper relief. No new rights have been acquired, nor old ones lost. The complainant can be restored to her position before she gave her release to the ex-

ecutor. The administration of the estate is still pending in the probate court. The complainant has been receiving the annuities. She proposes in her bill to give credit to the estate on the accounting for what she has received. The facts came to her knowledge May 25, 1907. The bill was filed about two months later. On February 6, 1908, the complainant filed in the probate court formal notice of her election in writing. We do not think this was necessary. The filing of the bill was an election of which all parties had notice.

The order of this court will be that the decree of the Circuit Court be reversed, and that a decree be entered that the instrument mentioned in the bill purporting to be executed by the complainant of date September 4, 1901, wherein she relinquished all her rights and interests in the estate, except an annuity of $500 per annum, and agreed to accept the provisions of the will of her said husband as entirely binding upon her, be set aside, canceled, and in all respects held for naught, and that the said complainant is well entitled to her proper share of the real and personal estate of her said husband such as she would have had if no provision had been made in her behalf in said will; that an account be taken of the amount and value of her said share in the personal property and of its just liabilities to the rest of the estate, and that, upon the adjustment of such account and the ascertainment of the balance due to her, she be declared duly entitled to recover it from the executors, and, further, that she recover her proper share of the real estate of her deceased husband from the defendants, who are also sued as devisees under said will. It is contended by counsel for the appellees that the accounting should not be undertaken by the federal court, but should be left to the probate court. We are, however, of a different opinion. The duty of the federal court in such cases is not discharged by the mere declaration of the rights of parties in general terms which are abstract and reach no concrete result. Having jurisdiction to determine the validity of a claim, it has authority to settle and determine its scope and limitations, and, if the claim is for money, the amount which the plaintiff is entitled to recover. To this extent, at least, the power of the federal court is as ample as that of the state court, and, when the former is invoked by a citizen of another state, its exercise cannot rightfully be denied.

The decree which we propose is, in this respect, substantially the same as that made in Byers v. McAuley, supra, and by this court in Comstock v. Herron, and in Cowen v. Adams; and the judgment in the latter case was affirmed by the Supreme Court.

The accounting is a simple matter, and might have been had in the court below if some further evidence had been taken upon that subject. But the attempt to do this was resisted before the examiner when counsel for the complainant was examining witnesses and sought the production of the books of the company for the purpose of ascertaining its financial condition. Counsel for the defendant directed the witnesses not to answer the questions and not to produce the books of the company. The view of counsel seems to have been that the testimony was not relevant to the issue then being proceeded with. We think the counsel was mistaken in supposing the testimony was

not competent upon the direct issue. It had a bearing upon the question of the disparity between the value of what the complainant lost and what she received. It was not so far remote as to deprive it of any value. The witnesses obeyed the counsel's directions, and the testimony was not obtained. This was wholly unauthorized. The counsel ought not to have undertaken to dominate the proceedings in this way. The proper course, if he deemed the testimony objectionable, was to state his objections on the record. Then the questions should have been answered, and the examiner should have taken down the answers. The court would then at the hearing determine for itself in regard to the competency and relevancy of the proof and the sufficiency of the objection. By the course pursued counsel anticipated the court's decision and substituted his own. This is by no means the first occasion of the kind which we have had in our experience, and we acquit the counsel of any wrong purpose. The practice often leads to great inconvenience. It leaves the court below and the appellate court to the necessity of hearing the cause without full proof. If it turns out that the objection was not well taken, it involves the necessity of going back and taking the omitted testimony, and the delay of the judgment, as well as the increase of the cost and expenses of the proceedings, follow. Only recently we had a similar experience, and restated our objection to the practice. Hardesty Mfg. Co. v. Yesbera (C. C. A.) 166 Fed. 120. Rule 67 of the equity rules prescribed by the Supreme Court reads as follows:

"Any question or questions which may be objected to shall be noted by the examiner upon the depositions: but he shall not have power to decide on the competency, materiality, or relevancy of the questions; and the court shall have power to deal with the costs of incompetent, immaterial, or irrelevant depositions, or parts of them, as may be just."

Decree reversed, with costs, and the cause remanded with direction to decree for the complainant as indicated in the foregoing opinion.